## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BRIAN FORD, Derivatively on Behalf of
Nominal Defendant QUALCOMM
INCORPORATED,

         Plaintiff,

   v.

DEREK K. ABERLE, STEVEN R. ALTMAN,
DONALD J. ROSENBERG, WILLIAM F.
DAVIDSON, JR., PAUL E. JACOBS, STEVEN
M. MOLLENKOPF, MARK MCLAUGHLIN,
MARK FIELDS, JEFFREY HENDERSON,
ANN LIVERMORE, HARISH MANWANI,
CLARK RANDT, IRENE ROSENFELD,
KORNELIS SMIT, ANTHONY
VINCIQUERRIA,

         Defendants,

and

QUALCOMM INCORPORATED,

         Nominal Defendant.

Case No. 1:20-cv-00748-LPS

**PUBLIC VERSION**

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Brian Ford ("Plaintiff") brings this stockholder derivative action on behalf of Qualcomm Incorporated ("Qualcomm" or the "Company") and against certain current and former officers and directors of the Company for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, and unjust enrichment.

Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes

1

without limitation: (a) review and analysis of documents obtained by means of requests for inspection of books and records under 8 *Del. C.* § 220; (b) review and analysis of public filings made by Qualcomm and other related parties with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (d) review of news articles, stockholder communications, and postings on Qualcomm's website concerning the Company's public statements; (e) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *In re Qualcomm Incorporated Securities Litigation*, Case No. 3:17-cv-00121-JAH-WVG (S.D. Cal) (the "Securities Class Action"); and (f) review of other publicly-available information concerning Qualcomm and the Defendants.[1]

## I.   INTRODUCTION

1.    Plaintiff brings this action derivatively for the benefit of Nominal Defendant Qualcomm against certain of the Company's current and former executive officers and directors aiming to rectify Defendants' violations of the Exchange Act, and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings from approximately February 1, 2012 through the present (the "Relevant Period").[2]

---

[1] While Plaintiff's counsel has conducted its own, independent investigation, many of the allegations herein (and, in particular, the allegations that relate to confidential witness ("CW") accounts) are contained in a Consolidated Class Action Complaint for violation of the federal securities laws (the "Securities Complaint") filed against the Company and certain of its officers and directors in the Securities Class Action.

[2] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 1, 2012 through

2.     This action concerns Qualcomm's false representation that it licensed its standard-essential patents on a non-discriminatory basis to the entire cellular communications industry. Instead of abide by that representation—one it made repeatedly to industry participants, standard-setting bodies, and investors—Qualcomm and its top executives decided rather to exploit the Company's position as the holder of the industry's standard-essential patents to suppress competition, drive its rivals out of business, and extract supra-competitive royalties. To that end, in 2008, prior to the Relevant Period, Qualcomm and its top executives amended the Company's well-established licensing policies, began refusing to offer licenses to standard-essential patents to competing chipmakers, and doled out royalty relief to mobile phone manufacturers that agreed to largely or exclusively purchase Qualcomm's chipsets. These undisclosed, highly exclusionary practices succeeded: within just seven years of the undisclosed change in its licensing policy, Qualcomm's revenues from chipset sales tripled, rising by approximately $10 billion, and virtually all competition was defeated.

3.     But false representations, especially ones made to standard-setting bodies and industry participants for over a decade, have consequences. Anticompetition regulators across three continents have recently charged or found Qualcomm liable for violating competition laws based on its blanket refusal to license its standard-essential patents to competitor chipmakers and other unfair and discriminatory conduct. One of those regulators, the KFTC, recently levied a record fine approaching $1 billion and issued a detailed and damning order condemning Qualcomm's multi-year effort to eliminate competition. And another regulator, the FTC, recently brought a similar enforcement action to enjoin Qualcomm's anticompetitive licensing model. Qualcomm's investors, including Plaintiff here, have likewise suffered. These revelations of

January 20, 2017; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient

Qualcomm's clear-cut anti-competitive practices dealt a swift and severe blow to the value of the Company's shares, causing Qualcomm's stock price to plummet 33% during the Relevant Period, erasing over $32 billion in shareholder value.

4.      Qualcomm went public in 1991 as a fledgling company with no profits, few customers, and sorely in need of a capital infusion. The Company's prospects improved drastically in 1993, when Dr. Irwin Jacobs, the Company's then-Chairman and Chief Executive Officer ("CEO"), succeeded in convincing the titans of high technology to select Code-Division Multiple Access ("CDMA") as a cellular "standard." A cellular standard functions as a technical "language" that allows cellular devices and cellular networks to interact. Without a common technical standard, cellular networks would not function, as different brands of phones would be unable to operate with each other or the network infrastructure in between.

5.      Qualcomm held nearly all patents essential for anyone to use CDMA technology. If CDMA were accepted as the standard, all participants in the telecommunications industry— including mobile phone companies, equipment manufacturers, chipset makers, and network carriers—would have to use Qualcomm's patented technologies. As such, if its CDMA were adopted, Qualcomm would be able to demand licenses to use its essential patents from industry participants, and thus profit handsomely.

6.      Participants in the wireless industry were understandably wary about adopting CDMA as the standard. They were apprehensive about what would happen if Qualcomm, after the adoption of CDMA and follow-on technologies, refused to license its essential patents to its competitors. They were also worried that Qualcomm would insist on bundling the terms of its license agreements with the purchase of Qualcomm downstream products, such as the Company's chipsets, once the industry was "locked in" to the CDMA standard. To avoid these

risks, industry participants required the Company and its executives to commit to the industry's standard-setting bodies that they would license Qualcomm's patents essential to the standard ("standard-essential patents" or "SEPs") to all companies on a "fair, reasonable, and non-discriminatory basis." Qualcomm and its executives made and reaffirmed this commitment—known as the "FRAND" commitment—hundreds of times to the standard-setting bodies in written declarations and certifications.

7.     Qualcomm's compliance with its commitment to the standard-setting bodies and industry participants was also critically important to investors because it strongly impacted the risk profile of an investment in the Company. Failure by Qualcomm to fulfill its commitment to license its standard-essential patents would result in enforcement actions and fines by regulators, as well as civil lawsuits for injunctions and money damages by industry participants. For this reason, Qualcomm and its executives affirmatively represented in reports filed with the SEC and in their public statements that they "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis" and that the Company had complied with that commitment.

8.     Qualcomm's executives affirmed these representations regarding the Company's commitment to license its standard-essential patents on a fair, reasonable, and non-discriminatory basis with further assurances during analyst calls, investor conferences, and press releases, including unequivocal statements such as "we've never refused to license," "we license broadly," we made our standard-essential patents "available to the industry," and we license so "the entire market could play." As Defendants acknowledged prior to the Relevant Period, "a decision that we are going to license you and not license you … would be discriminatory" and "saying we refuse to license competitors is like saying McDonald's refuses to sell hamburgers ....

5

It's nuts. It's crazy!" These unequivocal assurances that Qualcomm was willing to license to anyone was held out as the "hallmark" of the Company's licensing model—or so Qualcomm and its top executives led investors to believe.

9.      In addition to licensing its patents, Qualcomm designs and sells "chipsets." These integrated semiconductor circuits, which are contained in virtually every cellular phone, function as a wireless controller or application processor for the device. Qualcomm began manufacturing chipsets for cellular phones in 1992. For the next fifteen years, Qualcomm faced robust competition from other chipset manufacturers, including Texas Instruments, MediaTek, Broadcom, Freescale, Infineon, Motorola, NEC, and STMicro, among others. These companies all produced chipsets that could perform virtually all of the digital functions of a cellular phone, and some of these companies produced chipsets that were considered, in terms of both price and quality, superior to Qualcomm's chipsets. In 2006, for example, Texas Instruments held a commanding 42% share of the wireless chipset market, with Qualcomm's market share hovering in the 18 to 20% range.

10.     Then, starting in 2008, an unexpected shift occurred. Qualcomm's share of the chipset market spiked—along with its chipset revenues—and competitors were forced to exit the industry. In 2008, for example, Qualcomm saw its share of the chipset market nearly double to 37% from the year before. Over the next six years, Qualcomm's share of the global chipset market continued to climb, achieving a remarkable 66% share in 2014—two-thirds of the entire worldwide market. And Qualcomm gained even more dominance over the market for CDMA chipsets, in which it commanded more than 90% of the market for each year between 2008 and 2014. As would be expected, as Qualcomm's share of the chipset market swelled, so too did the Company's revenues attributable to chipset sales. Between 2008 and 2014, Qualcomm's chipset

revenues tripled, from $6.7 billion in 2008 to over $18.6 billion in 2014. Thus, in a matter of only a few years, Qualcomm went from one in a field of many competitors to the global powerhouse in the burgeoning market for mobile-phone chipsets.

11.    Unknown to investors during the Relevant Period, Qualcomm achieved dominance over the mobile chipset market by violating its commitment to standard-setting bodies and industry participants, by violating worldwide anti-competition laws, and by violating its affirmative representations to investors. Contrary to its public representations that the Company licensed its cellular technologies "broadly" on a "non-discriminatory" basis to the "entire industry," Qualcomm adopted a policy beginning in the 2008 timeframe of refusing to license its standard-essential patents to competitor chipset manufacturers. Without a license to these standard-essential patents, Qualcomm's rival chipmakers were doomed to fail. And that is precisely what happened: mobile phone manufacturers were loath to buy chipsets from unlicensed companies. Accordingly, within a matter of a few years, nearly all of the leading chipset manufacturers exited the market, leaving Qualcomm with an iron grip over the entire global mobile telecommunications industry.

12.    Qualcomm's policy of refusing to license competitors has now been exposed. Major industry participants—including Intel, Samsung, Apple, MediaTek, among others—have detailed how Qualcomm stifled competition by refusing to license its standard-essential patents to chipset manufacturers. As explained by Mr. Wei-Fu Hsu, MediaTek's long-time chief legal officer, MediaTek "specifically demand[ed] patent license negotiations" during the Relevant Period, and "did raise this request for a license several times," but was repeatedly rebuffed by Qualcomm and its senior executives. Qualcomm similarly blocked Samsung, Intel, Via

Technologies, and other competitors from obtaining licenses to the necessary patents for the cellular standards.

13.    Regulators in the United States, Asia, and Europe have initiated enforcement actions against Qualcomm for violating fair competition and antimonopoly laws by refusing to license competitors—and, in the case of the KFTC, found Qualcomm liable and fined it nearly a billion dollars. Confronted with the KFTC's evidence, Qualcomm ultimately admitted to having engaged in the fundamentally unfair and discriminatory practice of refusing to license its competitors for over the past nine years, which enabled its rise to dominance.

14.    In addition to misrepresenting its willingness to license to the entire industry, Qualcomm also falsely assured investors that the Company did not "bundle" the terms of its license and chipset agreements. The commitment to license on fair and non-discriminatory terms obligates holders of standard-essential patents (such as Qualcomm) to license their essential patents, irrespective of whether licensees also agree to purchase the patent holder's downstream products (such as Qualcomm's chipsets). In this case, Qualcomm and its top officers not only committed to license on non-discriminatory terms—and, thus, not bundle—but they also affirmatively represented to investors that "we don't bundle." Indeed, during investor conference calls in the Relevant Period, Qualcomm's senior officers, including its current President and CEO, quieted investor concerns with specific representations that "we don't bundle those together" and "we have been very clear that we keep those two things separate."

15.    As investors have begun to understand, however, Defendants' representations concerning the purported separation of the terms and negotiations of Qualcomm's licensing and chipset sales agreements were false, misleading, and omitted material facts. In January 2017, both the FTC and Qualcomm's largest customer, Apple, detailed in public filings how

Qualcomm reinforced its grip on the mobile chipset industry by bundling the terms of its license agreements with chipset sales. Qualcomm gave handset manufacturers a clear avenue to obtain royalty relief on their licenses: buy only Qualcomm's chips. In the words of the FTC, "Qualcomm has offered customers incentive payments (often tied to their purchase of Qualcomm's processors [i.e., chipsets]) to induce those customers to accept Qualcomm's preferred license terms" in order to "'close the gap' with customers that resist license terms they regard as unreasonable."

16.    Qualcomm's practice of bundling the terms of its license and chipset sales agreements has been further confirmed by, among others, former high-level employees of the Company, its customers, and its competitors. For example, Qualcomm's former Vice President of Technology explained that when making chipset agreements with customers, "there was always a QTL [license business] component that would act in the background." A former senior member of Apple's Patent Licensing & Strategy department confirmed that Qualcomm provided royalty rebates tied to chipset purchases, explaining that "if you buy 'x' number of chips over so many years, Qualcomm will give you something else and that will offset what you have to pay for the license." Mr. Hsu, MediaTek's general counsel, confirmed that he heard from multiple companies during the 2012 to 2013 timeframe, including Huawei, ZTE, and other handset manufacturers, that if a licensee wanted a royalty reduction they had to buy Qualcomm chipsets.

17.    When the truth was disclosed about Qualcomm's refusal to license its competitors and the Company's bundling of licenses and chipset sales agreements, investors suffered greatly. With each successive revelation of the Company's previously-hidden practices, the market harshly responded, causing the value of Qualcomm's shares to plummet and investors to incur billions of dollars in damages.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

19.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' participation in the wrongful acts detailed herein, occurred in this district.  One or more Defendants either resides in or maintains offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous improper activities detailed herein and conducting business here, which had a material effect in this district.

20.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## III.     THE PARTIES

21.     Plaintiff has been a stockholder during the Relevant Period, is currently, and at all relevant times has been, a holder of Qualcomm common stock.

22.     Nominal Defendant Qualcomm is a corporation organized under Delaware law and headquartered at 5775 Morehouse Drive, San Diego, California. Qualcomm holds patents essential to certain cellular communications standards. Qualcomm has committed to standard-setting bodies to license those patents on a fair, reasonable, and non-discriminatory basis.

10

Qualcomm has also become one of the world's largest chipset suppliers. The Company's primary business segments are Qualcomm Technology Licensing ("QTL"), which receives royalty payments from its licensees of the cellular technologies, and Qualcomm CDMA Technologies ("QCT"), which supplies mobile chipsets. These two business segments accounted for virtually all of the Company's revenues and profits during the Relevant Period. Qualcomm's stock trades on the NASDAQ Stock Market under the symbol "QCOM."

23.     Defendant Derek K. Aberle ("Aberle") was Qualcomm's President until August 2017 and a member of Qualcomm's Executive Committee since 2008. Defendant Aberle joined Qualcomm in December 2000 and held numerous executive-level positions at the Company prior to becoming its President. These positions included: Executive Vice President and Group President from November 2011 to March 2014; President of QTL from September 2008 to November 2011; and Senior Vice President and General Manager of QTL from October 2006 to September 2008. As acknowledged in the Company's March 10, 2014 press release, Defendant Aberle was "instrumental in creating and growing many important areas of Qualcomm's business over the past 13 years, including [its] licensing business."[3] Defendant Aberle has further been described by the Company on its website as having, over the past decade, personally "played a leading role in structuring and negotiating key license agreements with Qualcomm's licensees."[4] During the Relevant Period, Aberle regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Defendant Aberle made certain of the misstatements and omissions alleged herein.  According to the Company's Proxy Statements, during the Relevant Period, Defendant Aberle received the following compensation for his role in the Company:

---

[3] Press Release, Qualcomm Inc., "Derek Aberle Named Qualcomm President" (Mar. 10, 2014).
[4] *Id.*

| Year | Total Compensation |
|---|---|
| 2016 | $10,544,826 |
| 2015 | $5,342,922 |
| 2014 | $32,103,659 |
| 2013 | $10,057,435 |
| 2012 | $11,129,458 |

24. Defendant Steven R. Altman ("Altman") was the President and Vice Chairman of Qualcomm and a member of its Executive Committee for over 15 years. While at Qualcomm, Defendant Altman's roles included: Vice Chairman from November 2011 to January 2013; President of Qualcomm from July 2005 to November 2011; Executive Vice President from November 1997 to June 2005; President of QTL from September 1995 to April 2005; and General Counsel from October 1989 through September 2000. As the Company stated in its press releases, Defendant Altman was the "chief architect of Qualcomm's IP licensing strategy" and was "responsible for structuring and negotiating key license agreements."[5] Defendant Altman has stated publicly that he was "an active participant in essentially every major transaction in which the company has taken part." During the Relevant Period, Altman regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Defendant Altman made certain of the misstatements and omissions alleged herein.

25. Defendant Donald J. Rosenberg ("Rosenberg") has been Executive Vice President, General Counsel and Corporate Secretary of Qualcomm Incorporated since October

[5] Press Release, Qualcomm Inc., "Steve Altman, Qualcomm Vice Chairman, to Retire" (Oct. 16, 2013).

2007. Rosenberg reports directly to Qualcomm's CEO Defendant Mollenkopf, and is a member of Qualcomm's Executive Committee. In his role as General Counsel, Defendant Rosenberg is responsible for overseeing Qualcomm's worldwide legal affairs, intellectual property and corporate matters. During the Relevant Period, Rosenberg regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Defendant Rosenberg made certain of the misstatements and omissions alleged herein.  According to the Company's Proxy Statements, during the Relevant Period, Defendant Rosenberg received the following reported compensation[6] for his role at the Company:

| Year | Total Compensation |
|------|--------------------|
| 2013 | $6,291,491 |
| 2012 | $6,192,434 |

26.     Defendant William F. Davidson, Jr. ("Davidson") joined Qualcomm in February 2002 and was Senior Vice President of Qualcomm's Strategy and Operations for Global Market Development for QTI from May 2013 to August 2014. Prior to that time, Defendant Davidson was Qualcomm's Senior Vice President of Investor Relations from April 2007 to August 2014, and Senior Vice President of Global Marketing from April 2007 to August 2012. During the Relevant Period, Davidson regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Defendant Davidson made certain of the misstatements and omissions alleged herein.

---

[6] Compensation for Defendant Rosenberg for fiscal years 2014-2019 was not reported in the Company's Proxy Statements.

27.     Defendant Paul E. Jacobs ("Jacobs") was the Chairman of the Board of Directors of Qualcomm from March 2009 until March 2019. In addition, Defendant Jacobs was the Company's Chief Executive Officer from July 2005 to March 2014. Before becoming CEO, Defendant Jacobs was the Executive Vice Group President of the Qualcomm Wireless & Internet Group from July 2001 to July 2005, and Executive Vice President from February 2000 to June 2005. As Qualcomm has acknowledged on its website, Defendant Jacobs was "a key architect of Qualcomm's strategic vision."[7] Defendant Jacobs signed and certified the Company's quarterly and annual SEC filings between 2012 and 2016. During the Relevant Period, Jacobs regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Defendant Jacobs made certain of the misstatements and omissions alleged herein.  According to the Company's Proxy Statements, during the Relevant Period, Defendant Jacobs received the following compensation for his role in the Company:

| Year | Total Compensation |
|------|--------------------|
| 2018 | $14,090 |
| 2017 | $18,000,061 |
| 2016 | $9,173,340 |
| 2015 | $9,314,813 |
| 2014 | $56,941,992 |
| 2013 | $20,448,940 |
| 2012 | $20,730,873 |

---

[7] Website biography, Qualcomm Inc., Leadership: Dr. Paul E. Jacobs, Executive Chairman and Chairman of the Board, https://www.qualcomm.com/company/ about/leadership/paul-jacobs.

14

28.     Defendant Steven M. Mollenkopf ("Mollenkopf") is Qualcomm's Chief Executive Officer. Defendant Mollenkopf has been Qualcomm's CEO since March 2014, a member of the Company's Board of Directors since December 2013, and a member of Qualcomm's Executive Committee since July 2008. Defendant Mollenkopf first joined Qualcomm in 1994 and held numerous executive-level positions at the Company prior to becoming its CEO. These positions included President and Chief Operating Officer ("COO") from November 2011 through December 2013; Executive Vice President and Group President from September 2010 to November 2011; Executive Vice President and President of QCT from August 2008 to September 2010; Executive Vice President of QCT Product Management from May 2008 to August 2008; Senior Vice President of Engineering and Product Management from July 2006 to May 2008; and Vice President of Engineering from April 2002 to July 2006. As CEO, Mollenkopf is responsible for overseeing Qualcomm's QCT division. Prior to his promotion to CEO, Defendant Mollenkopf, by his own account, "led the Company's chipset business" at Qualcomm.[8] In addition to running the chipset business, Defendant Mollenkopf also played a critical role in helping to "define and implement Qualcomm's strategy and technologies."[9] Defendant Mollenkopf signed and certified the Company's quarterly and annual SEC filings from the second quarter of 2014 to the first quarter of 2017. During the Relevant Period, Mollenkopf regularly spoke to investors and securities analysts regarding the Company and its licensing model, professing to know what he was speaking about. Defendant Mollenkopf

---

[8] Website biography, Qualcomm Inc., Leadership: Steve Mollenkopf, Chief Executive Officer, https://www.qualcomm.com/company/about/leadership/stevemollenkopf.

[9] Website biography, Qualcomm Inc., Leadership: Steve Mollenkopf, Chief Executive Officer, https://www.qualcomm.com/company/about/leadership/stevemollenkopf.

made certain of the misstatements and omissions alleged herein. According to the Company's Proxy Statements, during the Relevant Period, Defendant Mollenkopf received the following compensation for his role in the Company:

| Year | Total Compensation |
|------|--------------------|
| 2019 | $23,065,052 |
| 2018 | $19,975,472 |
| 2017 | $11,591,310 |
| 2016 | $11,066,012 |
| 2015 | $10,372,325 |
| 2014 | $60,740,592 |
| 2013 | $14,308,066 |
| 2012 | $14,249,516 |

29.     Defendants Aberle, Altman, Rosenberg, Davidson, Jacobs, and Mollenkopf are collectively referred to herein as the "Executive Defendants."

30.     Defendant Mark McLaughlin ("McLaughlin") is and has been the Chairman of the Board since August 2019 and a director of the Company since July 2015. Defendant McLaughlin has extensive experience in the technology field. Defendant McLaughlin has been the Vice Chairman of the Board of Palo Alto Networks, Inc., a network security company, since June 2018. He served as Chairman of the Board and Chief Executive Officer of Palo Alto Networks from August 2016 to May 2018. He served as Chairman of the Board, President and Chief Executive Officer of Palo Alto Networks from April 2012 to August 2016. He joined Palo Alto Networks as President and Chief Executive Officer, and as a director, in August 2011 and

16

became Chairman of the Board in April 2012. Defendant McLaughlin served as President and Chief Executive Officer and as a director of VeriSign, Inc., a provider of Internet infrastructure services, from August 2009 to August 2011 and as President and Chief Operating Officer from January 2009 to August 2009. Mr. McLaughlin served in various other management and leadership roles at VeriSign from February 2000 through November 2007 and provided consulting services to VeriSign from November 2008 to January 2009. Prior to joining VeriSign, Mr. McLaughlin was Vice President, Sales and Business Development at Signio Inc., an internet payments company acquired by VeriSign in February 2000. According to the Company's Proxy Statements, during the Relevant Period, Defendant McLaughlin received the following compensation for his role in the Company:

| Year | Total Compensation |
| --- | --- |
| 2019 | $388,350 |
| 2018 | $347,803 |
| 2017 | $333,015 |
| 2016 | $390,034 |
| 2015 | $145,622 |

31.     Defendant Mark Fields ("Fields") is and has been a director of the Company since June 2018. Defendant Fields is a member of the Board's Audit Committee.     Defendant Fields has extensive experience serving as a director and in leadership roles of other public companies. Defendant Fields served as President and Chief Executive Officer of Ford Motor Company from 2014 to 2017, and prior to this held the Chief Operating Officer role from 2012 to 2014. He was Executive Vice President & President of the Americas from 2005 to 2012, Executive Vice President and Chief Executive Officer of Premier Automotive Group and Ford Europe from

17

2004 to 2005, Chairman and Chief Executive Officer of the Premier Automotive Group from 2002 to 2004, and was President and Chief Executive Officer of Mazda Motor Corporation from 2000 to 2002. Defendant Fields has served on the Boards of Ford (2014 to 2017), IBM (2016 to April 2018) and Mazda (1999 to 2002), as well as serving on boards of four private companies on behalf of TPG Capital. Defendant Fields received the following in total compensation for fiscal years 2018 and 2019:

| Year | Total Compensation |
|------|--------------------|
| 2019 | $313,548 |
| 2018 | $179,154 |

32.     Defendant Jeffrey Henderson ("Henderson") is and has been a director of the Company since January 2016. Defendant Henderson is a member of the Boards' Audit Committee.   Defendant Henderson has extensive experience serving as a director and in leadership roles of other public companies. Defendant Henderson has been an Advisory Director to Berkshire Partners LLC, a private equity firm, since September 2015. He served as Chief Financial Officer of Cardinal Health Inc., a health care services company, from May 2005 to November 2014. Prior to joining Cardinal Health, Defendant Henderson held multiple positions at Eli Lilly and General Motors, including serving as President and General Manager of Eli Lilly Canada, Controller and Treasurer of Eli Lilly Inc., and in management positions with General Motors in Great Britain, Singapore, Canada and the U.S. Defendant Henderson has been a director of Halozyme Therapeutics, Inc. since August 2015, a director of FibroGen, Inc. since August 2015, and a director of Becton, Dickinson and Company since August 2018. According to the Company's Proxy Statements, during the Relevant Period, Defendant Henderson received the following compensation for his role in the Company:

18

| Year | Total Compensation |
|------|--------------------|
| 2019 | $501,251 |
| 2018 | $466,775 |
| 2017 | $343,865 |
| 2016 | $344,040 |

33.     Defendant Ann Livermore ("Livermore") is and has been a director of the Company since October 2016. Defendant Livermore is a member of the Board's Governance Committee. Defendant Livermore has extensive experience serving as a director and in leadership roles of other public companies, including experience in the technology field. Defendant Livermore served as Executive Vice President of the Enterprise Business at Hewlett-Packard Company (HP) from May 2004 to June 2011, and as Executive Vice President of HP Services from 2002 to May 2004. She joined HP in 1982 and served in a number of management and leadership positions across the company. Defendant Livermore has been a director of United Parcel Services, Inc. since November 1997, and Hewlett Packard Enterprise since November 2015. Defendant Livermore was a director of HP from June 2011 to November 2015. According to the Company's Proxy Statements, during the Relevant Period, Defendant Livermore received the following in total compensation:

| Year | Total Compensation |
|------|--------------------|
| 2019 | $357,548 |
| 2018 | $365,038 |
| 2017 | $465,034 |

34.     Defendant Harish Manwani ("Manwani") is and has been a director of the Company since May 2014. Defendant Manwani is a member of the Board's HR and Compensation Committee.  Defendant Manwani has extensive experience serving as a director and in leadership roles of other public companies. Defendant Manwani was the Chief Operating Officer for Unilever PLC, a leading global consumer products company, from September 2011 to December 2014. He served as Unilever's President, Asia, Africa, Middle East and Turkey, which was later extended to include Central and Eastern Europe, from April 2005 to August 2011. He served as Unilever's President, Home & Personal Care, North America from March 2004 to March 2005. He served as Unilever's President, Home & Personal Care, Latin America and as the Chairman of Unilever's Latin America Advisory Council from April 2001 to February 2004. He served as Unilever's Senior Vice President, Global Hair and Oral Care from June 2000 to March 2001. He joined Hindustan Unilever Limited as a management trainee in 1976 and subsequently held various general management positions of increasing responsibilities within Unilever globally. Defendant Manwani has been a director of Whirlpool Corporation since August 2011, Nielsen Holdings plc since January 2015, and Gilead Sciences, Inc. since May 2018. He previously served as the Non-Executive Chairman of Hindustan Unilever Limited from July 2005 to June 2018 and as a director of Pearson plc from October 2013 to May 2018. According to the Company's Proxy Statements, during the Relevant Period, Defendant Manwani received the following compensation for his role in the Company:

| Year | Total Compensation |
|------|--------------------|
| 2019 | $333,548           |
| 2018 | $348,981           |
| 2017 | $330,515           |

| | |
|---|---|
| 2016 | $329,034 |
| 2015 | $323,011 |
| 2014 | $199,123 |

35.     Defendant Clark Randt ("Randt") is and has been a director of the Company since October 2013. Defendant Clark is a member of the Board's Governance Committee.  Defendant Randt has extensive experience serving as a director of other companies.  Defendant Randt has been a director of Valmont Industries, Inc. since February 2009, a director of the United Parcel Service, Inc. since August 2010 and a director of Wynn Resorts Ltd. since October 2015. According to the Company's Proxy Statements, during the Relevant Period, Defendant Randt received the following compensation for his role in the Company:

| Year | Total Compensation |
|---|---|
| 2019 | $331,548 |
| 2018 | $350,038 |
| 2017 | $343,015 |
| 2016 | $368,434 |
| 2015 | $376,969 |
| 2014 | $368,378 |

36.     Defendant Irene Rosenfeld ("Rosenfeld") is and has been a director of the Company since October 2018. Defendant Rosenfeld is a member of the Board's HR and Compensation Committee.  The Company notes that Defendant Rosenfeld is a "veteran of the consumer products industry." Defendant Rosenfeld is the former Chairman and CEO of Mondelēz International, a global snack food and beverage company. After a 20+ year career at

General Foods and then Kraft Foods, she became Chairman and CEO of Frito-Lay North America in September 2004. She returned to Kraft Foods in June 2006 as CEO, and then became Chairman in March 2007. Defendant Rosenfeld has been a director of Conyers Park II Acquisition Corp. since July 2019. According to the Company's Proxy Statements, Defendant Rosenfeld received $437,103 in total compensation for fiscal year 2019.

37.     Defendant Kornelis Smit ("Smit") is and has been a director of the Company since June 2018. Defendant Smit is a member of the Board's Audit Committee.  Defendant Smit has extensive experience serving as a director and in leadership roles of other public companies, including experience in the technology field.  Defendant Smit serves as a Vice Chairman of Comcast Corporation.  Previously, Defendant Smit served as President of Comcast Cable from 2010 to 2011, and then President and Chief Executive Officer of Comcast Cable from 2011 to 2017. Prior to this, he was at Charter Communications where he served as President and Chief Executive Officer and a Director from 2005 to 2010. Prior to joining Charter, Defendant Smit was President of Time Warner's America Online Access. Defendant Smit was a regional President with Nabisco, and held several management positions at Pillsbury. Defendant Smit has held several board positions: Chairman, Vice Chairman, and served on the audit committee of CableLabs; Chairman of C-SPAN; and Chairman, Treasurer and Secretary of the National Cable & Telecommunications Association (NCTA). According to the Company's Proxy Statements, during the Relevant Period, Defendant Smit received the following in total compensation:

| Year | Total Compensation |
|------|--------------------|
| 2019 | $363,548 |
| 2018 | $229,154 |

38.     Defendant Anthony Vinciquerra ("Vinciquerra") is and has been a director of the Company since July 2015. Defendant Vinciquerra is a member of the Board's Audit Committee. Defendant Vinciquerra has extensive experience serving as a director and in leadership roles of other public companies. Defendant Vinciquerra has been the Chairman and Chief Executive Officer of Sony Pictures Entertainment Inc. Defendant Vinciquerra was a Senior Advisor to Texas Pacific Group (TPG) in the Technology, Media and Telecom sectors, where he advised TPG on acquisitions and operations from September 2011 to June 2017. Defendant Vinciquerra was Chairman of Fox Networks Group from September 2008 to February 2011, and President and Chief Executive Officer from June 2002 to February 2011. Defendant Vinciquerra has been a director of Madison Square Garden Sports Corp. since April 2020. He previously served as a director of Pandora Media, Inc from March 2016 to June 2017, a director of Motorola Mobility Holdings, Inc. from January 2011 to May 2012, and a director of DirecTV from September 2013 to July 2015. According to the Company's Proxy Statements, during the Relevant Period, Defendant Vinciquerra received the following compensation for his role in the Company:

| Year | Total Compensation |
|------|--------------------|
| 2019 | $338,548 |
| 2018 | $366,538 |
| 2017 | $329,515 |
| 2016 | $358,034 |
| 2015 | $142,622 |

39.     Defendants McLaughlin, Fields, Henderson, Livermore, Manwani, Mollenkopf, Randt, Rosenfeld, Smit, and Vinciquerra are collectively referred to herein as the "Director Defendants."

23

40.     The Director Defendants, along with the Executive Defendants, are collectively referred to herein as the "Individual Defendants."

**Related Party Non-Defendants**

41.     Related Party Non-Defendant Jamie S. Miller ("Miller") is and has been a member of the Company's Board since May 2020.  Miller is included solely for the purpose of demand futility.

## IV.     BACKGROUND

### A.     Cellular Standards

42.     Much like human conversation requires participants to agree on which language to speak, manufacturers and vendors in the cellular communications industry needed to agree on a common set of technical standards in order for cell phones, cellular infrastructure, and related communication technologies from different companies to function and operate. Such common standards create the necessary technical "language" that enables mobile devices, cellular networks, and their component parts to communicate with one another. Without a common technical standard, the cellular network simply could not function.

43.     To develop a common set of cellular communications standards, participants in the cellular industry formed standard-setting bodies. A leading standard-setting body for the cellular communications industry is the European Telecommunications Standards Institute ("ETSI"). ETSI is composed of more than 800 members from countries across five continents, including manufacturers, network operators, service and content providers, national administrations, universities and research bodies, user organizations, and consultancy companies and partnerships. ETSI has a global perspective, and its standards are accepted throughout the

24

world, including in the United States. In addition to ETSI, other leading standard-setting bodies for the telecommunications industry include the Telecommunications Industry Association ("TIA"), the Cellular Telecommunications Industry Association ("CTIA"), the American National Standards Institute ("ANSI"), and the Alliance for Telecommunications Industry Solutions ("ATIS").

44.     Practically every participant in the development of communication technologies for the cellular industry is a member of one or more standard-setting bodies. Members include: (i) owners of patents underlying the standards, such as Nokia, Ericsson, and Qualcomm; (ii) chipset manufacturers, such as Intel, MediaTek, and Qualcomm, which make the baseband processor chipsets that enable cellular phones to communicate with a carrier's cellular network; (iii) handset manufacturers, such as Apple, Samsung, and LG, which make the cell phones used by consumers; and (iv) wireless carriers, such as AT&T, Verizon, Sprint, and T-Mobile, which operate the mobile wireless systems that allow users to place and receive telephone calls, and send and receive data on their cell phones.

45.     Professor Michael A. Carrier is a Distinguished Professor of Law at Rutgers University and an expert in antitrust and intellectual property matters. He has written more than 90 articles and book chapters on antitrust and intellectual property laws. Professor Carrier's scholarship has been cited in opinions of the U.S. Supreme Court, California Supreme Court, D.C. Circuit, Second Circuit, Third Circuit, Fourth Circuit, district courts, International Trade Commission, and Federal Trade Commission, as well as in congressional hearings, government officials' speeches, and congressional and government agency reports. Professor Carrier has testified before the U.S. Senate Judiciary Committee (Subcommittee on Antitrust, Competition Policy and Consumer Rights) and National Academies (Board on Science, Technology, and

Economic Policy), and given talks to the Canadian Competition Bureau, U.S. Department of Justice, FTC, and state attorneys general. He is a member of the Board of Advisors of the American Antitrust Institute and is a past chair of the Executive Committee of the Antitrust and Economic Regulation section of the Association of American Law Schools (AALS). As Professor Carrier has explained in connection with the Securities Class Action:

> The standards process is vital for products like cellular devices to exist. Without such common 'rules of the road,' it is hard to see how the industry would survive. To put things more practically, without industry standards, your iPhone would not be able to connect to multiple wireless networks, play videos compressed with particular technologies, or even connect to numerous charging outlets.

46.     Cellular standards incorporate technology covered by patents owned by various holders. Such patents are known as "standard-essential patents" or SEPs. All companies that seek to sell a product, service, or cell phone component that implements the cellular standard necessarily use the technology claimed in standard-essential patents. As a result, a company using a standard must obtain a license from the holder of the standard-essential patents to avoid infringing the patent. Without such a license to these essential patents, the company's products or services would infringe, and the patent holder could bring an action to enjoin the infringing conduct or obtain an award of monetary damages.

47.     For all of its benefits, standardization presents opportunities for abuse. Among other things, the holder of the standard-essential patents may abuse its position by: (i) refusing to license its patents to competitors (thus blocking competitors from using the standard); (ii) insisting on licensing terms that discriminate in favor of the patent holder's own downstream products (thus inducing licensees to purchase downstream products, such as chipsets, that they otherwise would not purchase); or (iii) demanding supra-competitive license terms beyond the value of the patent (thus extracting benefits from their patents to which they are not entitled).

The FTC has explained that "patent holdup" describes the potential that an "SEP holder can use the leverage it may acquire as a result of the standard setting process to negotiate higher royalty rates or other favorable terms after the standard is adopted than it could have credibly demanded beforehand."[10] Professor Carrier has further explained that "'patent holdup' has appropriately received antitrust attention since it reflects an abuse of the process, allowing a patent-holder to take advantage of investments made in conformance with a standard that would be rendered worthless if the implementer were forced to switch to a new technology."

### B.    The FRAND Commitment

48.    To safeguard against potential abuses of standardization, standard-setting bodies require, before adopting a standard, that all members who believe they hold standard-essential patents first identify and "declare" such patents, and then commit to grant licenses to those patents on a "fair, reasonable, and nondiscriminatory" basis. This licensing commitment, referred to as the "FRAND" or "RAND" commitment, is a critical aspect of the standard-setting process. If a holder of an essential patent refuses to make such a promise, the standard-setting body will pursue an alternative technology to include as part of the standard. A patent holder that makes the FRAND commitment promises to license its standard-essential patents to anyone willing to accept a license, and relinquishes its right to exclude a licensee from the standards-based technologies.

49.    The FRAND commitment is an important and necessary check on the patent holder's power to use its standard-essential patents to "holdup" implementers of the standard. Without a FRAND commitment, holders of standard-essential patents would have an easy path to monopoly profits because, once the standard is adopted, the patent holder could refuse to

_____

[10] Prepared Statement of the FTC Before the U.S. Sen. Jud. Comm. Concerning "Standard Essential Patent Disputes and Antitrust Law" (July 30, 2013), at 1.

license its essential patents, charge unreasonable or discriminatory terms, or bundle essential patents with other products, with all implementers of the standard having no choice but to use the patented standard and purchase the other products. The FRAND commitment is therefore a critical tool in preventing exploitative and exclusionary practices, and in ensuring that the standard remains accessible to all who wish to implement it. In exchange for making a FRAND commitment, the holder of the standard-essential patent receives the opportunity to obtain a reasonable royalty, as well as the industry's widespread adoption of a standard incorporating its patents.

50.     As Professor Carrier further stated:

FRAND obligations are essential to the standard-setting process. 'Ex ante,' before a standard is selected, a patent holder lacks market power. If, at such a time, it stated that it would refuse to license its patent, charge excessive or discriminatory royalties, or force implementers to license additional, non-standard-essential patents or purchase unrelated products, the organizations would quickly drop such patented technology from consideration. For that reason, 'ex post,' after the standard has been adopted, and when the organization is locked into using the technology, a patent holder's attempts to engage in such behaviors constitute an abusive exercise of market power that threatens the standard-setting process, competitors, and consumers.

51.     Industry organizations have also emphasized the importance of the FRAND commitment. For example, ACT, also known as the Association for Competitive Technology, is an industry group representing 5,000 small and mid-size cellular application developers and information technology firms. As ACT has explained, "[b]ecause the FRAND promise is designed to address the competitive problems that can occur with industry collaboration during the standardization process, the violation of a FRAND promise presents not merely contractual issues, but also significant competition law concerns."

52.     After making a FRAND commitment, the holder of a standard-essential patent is entitled to seek only a fair, reasonable, and non-discriminatory royalty from an implementer of

28

the cellular standard. The FRAND commitment includes three basic components relevant to this matter:

(a) **An obligation to license**. A standard-essential patent holder that elects to make a FRAND commitment is obligated to offer licenses to any entity that seeks a license. Having made the commitment to license on FRAND terms, thereby inducing others to adopt the standard, the holder of a standard-essential patent cannot then renege on its commitment and decide not to license certain companies. This has been confirmed by courts in this Circuit and around the world. The Ninth Circuit has recognized that, after making a FRAND promise, a standard-essential patent holder "cannot refuse a license to a manufacturer who commits to paying the RAND rate."[11] As Professor Carrier has explained, "a refusal to license, after having made the FRAND commitment, is as fundamental a breach of the FRAND licensing promise as can be envisioned."

(b) **An obligation not to discriminate against competitors**. Having made a FRAND commitment, the holder of the standard-essential patent also cannot discriminate when it licenses. Such discrimination occurs when the patent holder refuses to license certain categories of licensees (e.g., competitors). The requirement that a patent holder not discriminate in licensing helps to prevent standard-essential patent holders from squeezing out their competitors.

(c) **An obligation to license standard-essential patents on their own, without requiring that a licensee pay for other "bundled" items or products**. A holder of a standard-essential patent maintains a monopoly over the patent underlying the

---

[11] Microsoft Corp. v. Motorola, Inc., 795 F.3d 1024, 1031 (9th Cir. 2015).

standard. If unchecked, the holder of such a patent could exploit its monopoly by bundling a license to its FRAND-committed patent to the purchase of other products, which could allow it to charge above-FRAND royalty rates. A standard-essential patent holder that links its license to an agreement concerning a separate product is said to have "bundled" those two items.

53.    As Professor Carrier explained, the above three "basic components" lie at the core of the FRAND obligation:

> First, a FRAND commitment signifies a promise to license, which is directly breached by a refusal to license. Second, an obligation of nondiscriminatory treatment ensures that all potential implementers can obtain a license on similar terms, with an standard-essential patent holder's ability to pick and choose who can receive licenses on varying terms violating such a promise. Third, a FRAND commitment is violated by forcing (through refusal "sticks" or rebate "carrots") potential implementers to purchase separate items, which could result in supra-competitive royalty rates and which threatens even more severe harms than attempts to obtain injunctions.

54.    Mr. Wei-Fu Hsu, who served as MediaTek's General Counsel between 2008 and 2016 and the head of its legal department for a dozen years, likewise confirmed that "a basic component of the FRAND commitment is that a holder of a standard-essential patent must be prepared to offer a license to the patents, including competitors." Mr. Hsu explained that this component of the FRAND obligation is extremely important because, when standard-setting organizations' members are choosing between proposals for competing technologies to be adopted as a standard, the groups rely on a member's commitment to license its patents, on FRAND terms, in exchange for their agreement to adopt the technology as a standard.

55.    Mr. Hsu further clarified why the FRAND commitment is so important from an industry perspective. "Everybody has to use [the standard essential patents], no exceptions. Everyone is tied-up to the standard-essential patent holder's technology. A competitor, in

30

particular, would be stuck because it would be forced to change its manufacturing process to comply with the standard, but there would be no way for its products to use the technology without violating the essential patents." "For this reason," Mr. Hsu added, "standard-setting organizations always remind members making a technical contribution proposal for their technology to be adopted as standards that the member making the proposal must comply with its FRAND obligations if its technology is adopted."

56.     Qualcomm itself has publicly acknowledged that the FRAND commitment requires holders of standard-essential patents, such as itself, to broadly license, including to competitors. As Defendant Rosenberg told the FTC on June 13, 2011, the "foundational goal" of the standard-setting organizations' FRAND policy "is availability of licenses necessary to practice standards" and "[c]ertainly, a patent-holder who gives a FRAND commitment gives up the right to refuse to license."[12] Defendant Rosenberg has further acknowledged, when speaking to Qualcomm investors, that "a decision that we are going to license you and not license you … would be discriminatory."[13]

57.     Significantly, as discussed further below, despite its recognition that a refusal to license its standard-essential patents to competitors would in fact be "discriminatory," Qualcomm secretly employed a policy which was exactly that.

## V.     NATURE OF THE ACTION

### A.     Qualcomm Makes the FRAND Commitment

---

[12] Comments of Qualcomm Incorporated to FTC Patent Standards Workshop, Project No. P11-1204 (June 13, 2011), at 26.

[13] Transcript, "Qualcomm Inc. at Friedman Billings Ramsey Capital Markets Investor Conference" (Dec. 1, 2009).

58.     Qualcomm holds patents essential to CDMA and certain follow-on cellular technologies. Accordingly, beginning in 1985, Qualcomm advocated that cellular industry participants adopt CDMA and its follow-on technologies as the next cellular standards. Because Qualcomm held CDMA-related patents, the Company would be able to collect significant licensing royalties if CDMA were adopted by standard-setting organizations and market participants as the next cellular standard.

59.     Qualcomm encouraged members of the standard-setting bodies during open forum meetings to adopt CDMA as a second generation ("2G") cellular standard. The industry was initially hesitant to adopt CDMA as a standard, as many companies had already invested millions of dollars in technologies using a competing standard, Time Division Multiple Access ("TDMA"). In addition, industry members expressed reluctance to select CDMA as a standard because Qualcomm possessed near-total control over the patents underlying the CDMA technology. Key critics of CDMA included Ericsson and SCS Mobilcom/Telecom (Interdigital), which submitted technical objections against Qualcomm's CDMA designs and asserted patent infringement claims against the Company.

60.     By 1993, Qualcomm persuaded many standard-setting bodies—including CTIA, TIA, and others—to adopt CDMA as a new 2G cellular standard. As part of its efforts, Qualcomm submitted individualized written declarations, some of which were signed by Defendant Altman, stating that, for each CDMA patent it held, Qualcomm would "license [its] essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination."

61.     After successfully urging the industry's adoption of CDMA as a 2G standard, Qualcomm promoted several follow-on standards for adoption as the third generation ("3G") and

fourth generation ("4G") cellular standards. In connection with successfully urging standard bodies to adopt Qualcomm's technologies, Qualcomm again committed and certified in writing that "we will offer to license our essential patents for these CDMA standards on a fair, reasonable and nondiscriminatory basis." As a result of these repeated and specific assurances to standard-setting bodies, Qualcomm's technologies were adopted as 3G and 4G cellular standards throughout much of the developed world.

62.     Qualcomm has confirmed these facts to investors, and reiterated its purported commitment to license on a "fair, reasonable and non-discriminatory basis." As discussed more fully below, the Company in its securities filings disseminated to investors specifically highlighted how Qualcomm had "informed [the standard-setting bodies] that we hold patents that might be essential" for the cellular standards and "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." Qualcomm further assured investors that it, indeed, did offer licenses to interested companies on terms that are "fair, reasonable and nondiscriminatory."

### B.     Qualcomm Becomes One of the Most Powerful Technology Companies in the World

63.     Qualcomm went public in 1991. The Company initially struggled to turn a profit. In its first full year as a public company, Qualcomm reported a $4 million loss. But as the Company's CDMA technologies were increasingly adopted as cellular standards, Qualcomm's licensing revenues climbed.

64.     As Qualcomm has acknowledged, the adoption of CDMA as a cellular standard "open[ed] the door to the global proliferation" of Qualcomm's digital wireless technology. CDMA's adoption as a standard propelled the Company's revenues, generated millions of

dollars in high-margin royalties from those who wished to implement the CDMA standard, and caused the Company to realize immense profits. This is because, as the Company has acknowledged and publicly stated, after the adoption of CDMA and follow-on technologies, any company "seeking to develop, manufacture and/or sell products that use CDMA-based standards will require a patent license from us."[14] Accordingly, in the Company's first reported annual results after CDMA was adopted as a standard, Qualcomm recorded a profit of $12 million for fiscal 1993, after having posted a loss of $4 million the year before.

65.     In 1999, the selection of Qualcomm's CDMA and follow-on technology as part of the worldwide 3G cellular standard added new revenue streams for Qualcomm, and further entrenched the Company's dominant position in the industry. After the introduction of the 3G standard, the Company's licensing revenues nearly doubled, from approximately $404 million in fiscal 1999, to over $705 million in fiscal 2000, and Qualcomm's profits during that time more than tripled.

66.     By 2000, Qualcomm had been added to the S&P 500 and the Fortune 500 list, reflecting the Company's tremendous growth. Over the next decade-anda-half, as cell phones and smart phones became ubiquitous, Qualcomm continued to grow its revenues by persuading additional standard-setting organizations to adopt its wireless technologies as standards. This earned the Company praise as the "ATM of the wireless world" for its ability to generate a steady stream of profits in the form of licensing royalties paid for use of its standard-essential patents.[15]

67.     In addition to licensing its cellular technologies, Qualcomm derives a significant amount of revenue from the sale of chipsets. Qualcomm began producing chipsets for cellular

---

[14] Qualcomm Inc. 2012-2016 Forms 10-K.
[15] Dave Mock, The Motley Fool, "Qualcomm: Cash Cow" (Nov. 6, 2003).

Case 1:20-cv-00748-LPS   Document 6   Filed 08/06/20   Page 35 of 122 PageID #: 184

phones in 1992. Despite its initial success, Qualcomm was but one of many in a crowded field of chipset manufacturers. During the first fifteen years that Qualcomm was in the chip business, the Company faced strong competition from companies located across the United States, Asia, and Europe. Qualcomm's chipset competitors included, for example, Texas Instruments, MediaTek, Broadcom, Freescale, Infineon, Motorola, NEC, and STMicro, among others. These companies all produced chipsets that were considered competent to perform virtually all of the digital functions of a cellular phone. And some of these companies produced chipsets that were considered superior to Qualcomm's chipsets, in terms of both price and quality.

68.     This vibrant global chipset market that existed between 1992 and 2007 provided many alternative options for manufacturers of cell phones and their component parts. The availability of numerous alternatives to Qualcomm chipsets created intense pricing pressures across the industry and razor thin margins. For example, in 2005, analysts at Rosetta Group noted that competitor chipset manufacturers, including Texas Instruments and Freescale, had produced "custom solutions" in 3G and WCDMA chipsets that were priced "well below" two-thirds the cost of Qualcomm chipsets.[16] Thus, as of 2006, Texas Instruments held a commanding 42% share of the wireless chipset market, while Qualcomm's market share hovered in the 18 to 20% range that year and several years prior.

69.     Beginning in 2008, however, a shift occurred, as Qualcomm's share of the chipset market spiked. In 2008, Qualcomm saw its share of the chipset market nearly double from the year before to 37%. In 2009, analysts at Collins Stewart applauded Qualcomm's "commanding" place in the cellular chipset market, noting that "Qualcomm's technology and commanding

---

[16] Mona Eraiba, "Qualcomm: Broader Issues Than Inventories" (Apr. 24, 2005).

market position bodes well for its financial performance in 2010 and beyond."[17] Qualcomm's share of the global cellular chipset market continued to climb, achieving a remarkable 66% share in 2014—two-thirds of the entire worldwide market.

70.    Qualcomm attributed its remarkable success during this period to, among other things, its personnel, innovative technologies, and strategic partnerships. For example, during an analyst conference call on January 2, 2008, Defendant Jacobs claimed that the Company was able to consistently perform "extremely well" in a challenging environment, stating "[t]hat's really attribute[d] to our employees' focus, perseverance and dedication." Five years later, at a May 3, 2013 presentation at Stanford Business School on Qualcomm's leadership and vision, Defendant Jacobs underscored the Company's "fundamental values" of "innovation, execution, and partnership." Jacobs claimed that Qualcomm was able to secure a "leadership position" in the chipset industry by identifying strategic opportunities with companies both large and small "that will take the newest technology and bring it into the market, drive it very hard and then get everyone else to follow." Qualcomm dismissed as "jealousy" any suggestion that its success was due to factors other than the Company's superior personnel, technology, and strategic vision. As Defendant Jacobs commented during an analyst conference on November 19, 2014, "when you're successful, there is a lot of scrutiny" whipped up "by competitors who obviously don't like the fact that you're so successful."[18]

71.    As Qualcomm's share of the modem chipset market surged, so too did its revenues from licenses and patent royalties. In just a few years after 2008, Qualcomm became the global powerhouse in the mobile chipset market, with chipset revenues of over $12 billion

---

[17] Ashok Kumar, "QCOM positioned for long term growth" (Jan. 7, 2009).
[18] Transcript, "Qualcomm Inc. 2014 Analyst Meeting" (Nov. 19, 2014).

and total revenues approaching $20 billion. By 2012, Qualcomm was the world's third biggest semiconductor supplier among all suppliers, not just mobile companies. Market research firm IHS noted that Qualcomm's meteoric ascent represented "the biggest increase of any major semiconductor supplier in recent history."[19] Once Qualcomm's cellular technologies were adopted as industry standards and the Company generated billions of dollars in revenues attributable to licensing, royalties, and chip-sales, Qualcomm's market share and stock price soared, with the Company reaching a market capitalization of more than $137 billion in 2014.

72.     Significantly, although the size of the modem chipset market has more than doubled since 2008, virtually all of Qualcomm's competing chipset manufacturers exited the market. As reflected in the below chart, between 2008 and 2015, nine of the eleven largest chipset manufacturers left the market. NXP, Texas Instruments, and Freescale exited in 2008; NEC, Broadcom, and Ericsson each exited in 2014; and Nvidia and Marvell both left the market in 2015. And, meanwhile, not a single significant chipset manufacturer has entered the market since 2008. As a direct result of these companies exiting the industry, Qualcomm's chipset revenues increased dramatically, as reflected in the below chart.

[19] Jeff Defilippi, ARM Blogs, "Qualcomm Rides Wireless Wave to Take Third Place in Global Semiconductor Market in 2012" (Dec. 4, 2012).

37



73.    Unknown to investors at the time, and as discussed further below, Qualcomm achieved and maintained its dominance over competing chipset manufacturers by amending its licensing policy beginning in 2008. Thereafter, the Company implemented a policy of refusing to license its standard essential patents to any competing chipset manufacturer, which made it unworkable for other chipset makers to meaningfully compete. To further stifle any competition, Qualcomm bundled the terms of its license and chipset agreements, providing handset manufacturers with royalty relief only if they largely or exclusively purchased Qualcomm chipsets. These practices—which forced Qualcomm's competitors out of business and yielded billions in chipset revenues for Qualcomm—have recently been exposed and resulted in massive regulatory fines, enforcement actions, and investor losses.

### C.    Qualcomm Assures Investors That It Does Not Discriminate Against Competitors

74.    Not only did Defendants assure the telecommunications industry and the standard-setting bodies that Qualcomm complied with its FRAND commitment, but they also made the same representations to investors. Additionally, Defendants further represented to

38

investors that they "broadly licensed" their standard-essential patents to "everybody," were "pro-competitive," and did not "discriminate." These assurances were made on numerous occasions, in myriad investor presentations, and by each of the six Executive Defendants.

75.     Both before and during the Relevant Period, the Executive Defendants told investors that the Company licensed on a "non-discriminatory basis," with licenses to standard-essential patents offered to any company, including chipset manufacturers. For example, Defendant Altman stated during investor presentations in the lead-up to the Relevant Period that "[w]e have never refused to license our essential patent to any company to supply chips" and "we have never refused to license our WCDMA essential patents to any company." Defendant Davidson likewise told investors that "[w]e will license anyone who wants to go and have a license in CDMA," which supposedly was "the hallmark of that licensing program." He emphasized at a later investor conference that "we don't shut anybody out" and "[w]e'll license anyone who is willing to enter into the terms of our agreement." And Qualcomm specifically emphasized in its annual reports filed with the SEC and signed by Defendant Jacobs in the build-up to the Relevant Period that:

- "We license our CDMA intellectual property to the competitors of our QCT segment to support the deployment of CDMA-based systems";

- "[W]e have made licenses to our essential CDMA patents available to competitors of our QCT segment"; and

- "As part of our strategy to generate licensing revenues and support worldwide adoption of our CDMA technology, we license to other companies, including the competitors of our QCT segment."

76.     During multiple investor presentations prior to the Relevant Period, Qualcomm's top executives further represented how they had "made a decision and made it very early that Qualcomm would be in the business of licensing and enabling as many companies as possible to

produce products under its patent portfolio," with its licensees including "[o]ther chip manufacturers that do compete with Qualcomm in the chip market for wireless telephones."[20]

77.     Defendants specifically acknowledged that a refusal to license to competitor chip manufacturers would violate the Company's stated commitment to license on a non-discriminatory basis. For example, Defendant Rosenberg told the FTC that once a patent holder (such as Qualcomm) commits to license on a fair, reasonable, and non-discriminatory basis, it "*gives up the right to refuse to license.*"[21] Defendant Davidson acknowledged the same when he assured investors prior to the Relevant Period that "[w]e don't make a decision that we are going to license you and not license you because that would be discriminatory."[22]

78.     Qualcomm and the Executive Defendants have acknowledged their awareness of the Company's licensing and business model. For example, Defendant Altman, the Company's long-time President and head of its licensing unit for a half decade, was recognized by Qualcomm as the "chief architect of the Company's licensing business model." Altman, by his own account, was "an active participant in essentially every major transaction in which the company has taken part."[23] Defendant Aberle, who succeeded Altman as the head of Qualcomm's licensing group, was similarly recognized by the Company as having, "[f]or well over a decade, play[ed] a leading role in structuring and negotiating key license agreements with

---

[20] Transcript, "Qualcomm Inc. Licensing/IPR Overview Conference Call & Webcast" (June 21, 2006).

[21] Donald Rosenberg, Comments of Qualcomm Inc. to FTC Patent Standards Workshop (June 13, 2011).

[22] Transcript, "Qualcomm Inc. at Friedman Billings Ramsey Capital Markets Investor Conference" (Dec. 1, 2009).

[23] Press Release, "Qualcomm Announces Leadership Change and Promotions" (Oct. 4, 2011); Transcript, "Qualcomm Inc. Stockholders Meeting" (Mar. 8, 2005).

Qualcomm's licensees."[24] Defendant Rosenberg was also deeply immersed in the Company's negotiations with licensees and chipset manufacturers and has acknowledged his role in the Company's negotiations, stating that "[w]e try to negotiate all the time. That's what we do."[25] And for their parts, Defendants Mollenkopf and Jacobs, the Company's current and former CEO, respectively, each signed Qualcomm's SEC filings during the Relevant Period that purported to describe the Company's licensing policies. They also frequently met with regulators and appeared before regulatory bodies to discuss Qualcomm's licensing model and made repeated, specific assurances to investors and analysts on the subject.

79.     Defendants proceeded to tell investors during the Relevant Period that Qualcomm licensed its standard-essential patents to any company and on a non-discriminatory basis. For example, in its annual reports filed with the SEC and disseminated to investors in late 2012 and 2013, Qualcomm represented that it licensed its standard-essential patents to all "interested companies on terms that are fair, reasonable and non-discriminatory." Defendants echoed these representations during investor conferences, interviews, and press releases, assuring investors that Qualcomm continued to operate its licensing model consistent with how "we have done that for 30 years"—namely, licensing to all companies and on a basis that was "fair, reasonable and non-discriminate."[26]

80.     Defendants bolstered these representations when touting the Company's "licensing program," which purportedly "broadly licensed" to all industry participants and was "pro-competitive." Each of Qualcomm's quarterly reports filed with the SEC stressed that the

---

[24]  Website biography, Qualcomm Inc., Leadership: Derek K. Aberle, President, https://www.qualcomm.com/company/about/leadership/derek-aberle.

[25]  Transcript, "Qualcomm Inc. Annual Shareholders Meeting" (Mar. 8, 2016).

[26]  Lisa Wang, Taipei Times, "Qualcomm defends licensing fees" (June 24, 2016).

Company's licensing model "promot[ed] a highly competitive ... wireless industry" and "enabl[ed] new, highly cost-effective competitors to their products." Defendants made yet additional representations during Relevant Period interviews and investor conferences that further led investors to believe that Qualcomm licensed its standard-essential patents to all industry players on a non-discriminatory basis. For example:

- Defendant Altman, when questioned about how "this licensing model has worked," responded that Qualcomm made its patents "available to the industry through our licensing program";[27]

- Defendant Aberle told investors that, "when you think about Qualcomm ... once we solve [technological problems], we don't keep the technology to ourselves: our business model is to share that technology through licensing";[28]

- Defendant Rosenberg assured investors during the Relevant Period that "Qualcomm's business model – broadly licensing our technology and reinvesting in R&D – is enabling the success of many other companies in the wireless value chain";[29]

- Defendant Jacobs, when he spoke to investors, similarly highlighted that "one of the things that we've really focused on was making sure that we license broadly";[30]

---

[27] Mike Freeman, San Diego Union Tribune, "Qualcomm's Altman talks technology licensing" (Nov. 22, 2013).

[28] 2016 Shanghai Forum – Keynote Speech (Dec. 6, 2016).

[29] Intan Hamdan-Livramento, WIPO, "The Evolution of Technology Markets: Separating Fact from Fiction" (Apr. 2012).

[30] Transcript, "Qualcomm Annual Shareholder Meeting" (Mar. 5, 2013).

- Defendant Davidson, in his public interviews, also touted Qualcomm's purported "broad" licensing program, stating that Qualcomm "created this unique business model of not holding our patents to ourselves to advantage our own products, but creating a product of them and broadly licensing them on a pro-active basis";[31] and

- Defendant Mollenkopf further assured investors that "we figured out that the right business model was to actually focus on licensing the inventions, essentially through the standards bodies so that the entire market could play."[32]

81.    Significantly, Defendants continued to assure investors that Qualcomm maintained its "pro-competitive" model of "broadly licensing" to the entire industry even after regulators raised concerns that Qualcomm was, in reality, refusing to offer licenses to competitors. For example, on November 17, 2015, Qualcomm issued a press release in response to the KFTC Case Examiner's Report, which stated that Qualcomm suppressed market competition by excluding competitors. In its press release, Qualcomm quieted investors' concerns about the Case Examiner's Report with assurances that "the allegations and conclusions contained in the [KFTC Report] are not supported by the facts," further stating that Qualcomm's "patent licensing practices, which we and other patent owners have maintained for almost two decades [are] pro-competitive." Again on January 17, 2017, immediately after the FTC leveled its enforcement action, Qualcomm shot back with a press release in which Defendant Rosenberg assured the investing market that, contrary to the FTC's assertions, Qualcomm engaged in

---

[31] Power Talk, "The Current State and Future of Mobile with Qualcomm's Bill Davidson" (Feb. 18, 2017).

[32] Burns and Mollenkopf at the 12th SIEPR Economic Summit (Mar. 17, 2015).

"broad-based licensing of [its standard essential patents] on fair, reasonable and non-discriminatory terms."

82.    The market trusted Defendants' repeated representations during the Relevant Period and highlighted Qualcomm's "licensing model"—including its willingness to license to competitors—as a reason to buy its stock. For example, *Forbes*, in a March 23, 2012 article on Qualcomm, emphasized how Qualcomm "also licenses out its 3G technology to other chipset manufacturers that wish to sell CDMA-based chipsets to mobile manufacturers." Analysts at *Barron's*, in their November 25, 2013 report on Qualcomm, also emphasized how the Company, "[i]n addition to manufacturing its own chips, licenses its technology to other chipmakers, which provides a lucrative royalty stream." Analysts at Trefis, in their September 27, 2013 report on Qualcomm, similarly noted how "Qualcomm licenses CDMA technology to other chipset manufacturers that wish to sell CDMA-based chipsets to mobile manufacturers."[33] Likewise, *Forbes*, in its November 6, 2014 article on the Company, lauded Qualcomm's stock as a "big winner" and explained how the Company did not keep its standard-essential patents to itself, but rather "licens[ed] this technology to other chip makers."[34] Accordingly, when suggestions arose that the Company might not license to competitors, analysts, including BMO Capital Markets, found that the allegations "don't make sense," as Qualcomm supposedly does not "decline[] to issue licenses to chipset suppliers" and does not "prohibit[] these deals" with competitor chipmakers.[35]

---

[33] *See also, e.g.*, International Teletimes, "Qualcomm's got the mobile device market nailed" ("Qualcomm also licenses out its 3G technology to other chipset manufacturers that wish to sell CDMA-based chipsets to mobile manufacturers") (Jan. 23, 2012).

[34] Forbes, "Is Qualcomm's Business Model and Stock at Risk?" (Nov. 6, 2014).

[35] BMO Capital Markets, "Qualcomm: More Detail on China IPR Issues" (Aug. 14, 2014).

83.     Unknown to investors at the time, Defendants' representations about the Company's "broad" licensing model and specific denials of anti-competitive conduct were false, misleading and omitted material facts. As discussed further below, Defendants modified Qualcomm's basic licensing policy by 2008 and, after that point, refused to license Qualcomm's standard-essential patents to competitor chipmakers. This undisclosed policy change, aimed at stifling competition, violated the Company's oft-repeated commitment to license on a "fair, reasonable and nondiscriminatory basis" and, now revealed, has resulted in a near-billion dollar fine and antitrust enforcement worldwide.

### D.     Qualcomm Assures Investors That It Does Not Bundle Its Licensing and Chip-Sale Agreements

84.     Qualcomm also told investors that it kept the negotiations and terms of its license and chipset agreements separate—i.e., that it did not "bundle." These representations were critical to investors because, as discussed above, bundling the terms of its agreements violated Qualcomm's commitment to the standard-setting bodies to license on a fair, reasonable, and nondiscriminatory basis, and exposed the Company to regulatory actions and civil litigation.

85.     For years, investors sought assurances from Qualcomm and its senior management that the Company did not engage in the practice of bundling, but rather that it kept separate the terms of its license and chipset agreements. For example, in an earnings conference call prior to the Relevant Period, a J.P. Morgan analyst asked Defendant Altman whether, "in all of your royalties … and your agreements that you sign with everyone, are they all pretty much done at hand's length from QCT [i.e., the Company's chip business] irrespective of whether they [i.e., the licensees] actually purchas[e] chips from you." On this subject, Defendant Altman represented that—consistent with the Company's commitment to the standard-setting bodies— the Company's license agreements "absolutely [] are done without QCT's [i.e., the chipset

division's] involvement. It's a QTL business unit [i.e., the licensing division] that is responsible for that."[36]

86.     Throughout the Relevant Period, Defendants continued to represent to investors that Qualcomm did not bundle the negotiations and terms of its license and chipset agreements, as any such bundling would violate its commitment to license on a fair and non-discriminatory basis. For example, on November 27, 2012, Defendant Aberle spoke at the Credit Suisse Technology Conference in Scottsdale, Arizona, during which he specifically reassured investors:

> And within the Company, we tend to keep the licensing and the chip business very separate. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together.

87.     A few months later, Qualcomm's executives once again unequivocally stated to investors that the Company did not bundle the terms or negotiations of its license and chip agreements. In particular, on February 25, 2013, Defendants Mollenkopf, Aberle, and Jacobs made an investor presentation at the GSM Association Mobile World Congress. When questioned by an analyst about the Company's chip and licensing businesses, Defendant Mollenkopf responded: "Well, they are really separate businesses. I mean we have been very clear that we keep those two things separate – separate propositions to the customer. So, really two different things."

88.     Analysts and investors took comfort in these representations. Accordingly, when rumors developed that Qualcomm might be bundling the terms of its license and chip agreements, analysts likewise dismissed these rumors as fiction. On August 14, 2014, for example, BMO Capital Markets issued an analyst report that concluded that, in light of the

---

[36] Transcript, "Q3 FY 2005 Qualcomm Inc. Earnings Conference Call" (July 20, 2005).

Company's years of assurances, "[w]e do not believe that QCOM bundles chip-sales with patent deals," and adding that Qualcomm has "operated its two businesses independently, as we understand it."[37] In a later report, the same analysts echoed that, based on the Company's representations, "[w]e do not think the company engages in this anticompetitive practice [of bundling]."[38]

89. But as analysts and investors would ultimately learn, they did not "understand it" correctly: Defendants' assurances that the Company did not bundle were untrue, misleading, and omitted material facts. Government regulators and others have exposed that Qualcomm did, in fact, bundle the negotiations and terms of its license and chipset agreements. Specifically, as discussed further below, the Company provided extensive royalty relief to handset manufacturers, including its largest customer Apple, if they agreed to purchase all or most of their chipsets from Qualcomm—and not a competitor.

**E. Unknown to Investors During the Relevant Period, Qualcomm Refused to License Competitors and Bundled the Terms of Its License and Chip Agreements**

90. The KFTC found, and Qualcomm has now admitted, that the Company and its executives refused to offer licenses to their standard-essential patents to competitor chipset manufacturers. It has also been revealed that Qualcomm, contrary to its Relevant Period representations, bundled the terms and negotiations of its standard-essential patent licenses with its chipset agreements. These undisclosed practices, which contradicted Qualcomm's express public statements to investors, have been confirmed through numerous sources, including

---

[37] BMO Capital Markets, "Qualcomm: More Detail on China IPR Issues" (Aug. 14, 2014).

[38] BMO Capital Markets, "Qualcomm: Does a Split Make Sense? Outlook and Model Before the Call" (July 21, 2015).

regulators and industry participants, and have resulted in a regulatory fine of nearly $1 billion and multiple, ongoing enforcement actions and regulatory investigations across the globe.

### 1.    KFTC: Qualcomm Refused to License Competitors

91.    Beginning in August 2014, the KFTC conducted a non-public investigation into allegations of anti-competitive conduct by Qualcomm. The KFTC is held in high regard for its antitrust enforcement investigations. For example, the Department of Justice ("DOJ") has publicly praised KFTC for having "done an outstanding job in becoming a leader in the promotion of sound competition law and policy, not only in Asia, but throughout the world."[39] The DOJ has further recognized that the "KFTC has shown itself to be a valued partner in efforts to strengthen international cooperation in the competition area," and explained that the "U.S.-Korea bilateral antitrust relationship is a strong one, based on a firm tradition of cooperation on both enforcement and policy matters."[40] And in September 2015, the DOJ and FTC highlighted "the day-to-day working relationship we already enjoy with the KFTC" and entered into an agreement of cooperation reflecting the FTC's "interest in continuing and strengthening [its] relationship [with the KFTC] in the years to come."[41]

92.    The KFTC's investigation of Qualcomm's anti-competitive practices included on-site visits, review of electronic and hard-copy files, as well as written surveys and interviews of relevant witnesses and experts. In conducting its investigation, the KFTC adhered to the strict criteria set forth in its Guidelines, including the requirement that "[t]he concerned parties are

---

[39] *The Korean Fair Trade Comm'n and the Int'l Competition Network*, 2004 WL 5267573 (Apr. 20, 2014).

[40] *Id.*

[41] FTC Press Release, "Federal Trade Commission and Department of Justice Sign Antitrust Memorandum of Understanding with Korea Fair Trade Commission" (Sept. 8, 2015).

given opportunities to fully voice their opinions." Among other things, the KFTC held seven full commission hearings in connection with the Qualcomm investigation. Industry participants from across the globe participated in the commission hearings, including Qualcomm (US), Apple (US), Ericsson (Sweden), Huawei (China), Intel (US), LG (Korea), Nvidia (US), MediaTek (Taiwan), and Samsung (Korea).

93.     After completing its thorough investigation, the KFTC issued a Case Examiner's Report that contained more than 400 pages of investigatory findings, and exceeded 3,200 pages including annexes. The Case Examiner's Report found that Qualcomm suppressed market competition by excluding competitors. The KFTC provided Qualcomm with the Examiner's Report on November 17, 2015, and gave the Company nearly fourteen months to review and respond to the KFTC's initial findings, which it did during numerous non-public hearings.

94.     On January 20, 2017, the KFTC issued its 146-page Final Decision and Order and a summary of its Order.[42] The KFTC's primary finding was that, "[n]ot withstanding requests from rival modem chipset makers, Qualcomm refused or restricted the licensing of mobile communications SEPs (Standard-Essential Patents) that are essential in manufacturing and selling the chipsets in market."[43]

95.     As Professor Carrier has detailed, the KFTC deliberation process was extremely thorough: "[t]he KFTC issued a comprehensive and thoughtful 146-page opinion that cited legal opinions and enforcement actions from the U.S. and Europe and that resulted from a thorough investigation that included seven full-commission oral hearings and cooperation from industry

---

[42] KFTC Final Decision and Order, Decision No. 2017-0-25 (Jan. 20, 2017). All quotations of the Final Decision contained herein, which originally appeared in Korean, were translated by certified professional translators.

[43] Korea Fair Trade Commission, "KFTC imposes sanctions against Qualcomm's abuse of SEPs of mobile communications" (Dec. 28, 2016), at 1.

participants in Korea (Samsung and LG) and around the world (Apple, Intel, Nvidia, MediaTek, Huawei)."

96.     As detailed in the KFTC's Final Decision and Order, Qualcomm historically executed license agreements to its standard-essential patents to competitor chipset manufacturers. By 2008, however, the Company "established a business policy [that] amend[ed] [its] licensing policy." After 2008, Qualcomm "refused to execute license agreements with competing modem chipset manufacturers even if they requested the licensing of cellular standard-essential patents that are essential for the manufacture, sale, and use of modem chipsets." Confronted with the KFTC's evidence, Qualcomm "admitted" that it, indeed, had changed its licensing policies by 2008 and refused to license competing chipset manufacturers throughout the Relevant Period.

97.     In its Decision and Order, the KFTC documented many specific instances in which Qualcomm refused to offer a license to rival chipset manufacturers. The specific examples identified by KFTC, and the underlying facts, include the following:

(a) MediaTek is a manufacturer of chipsets, whose ability to compete has been severely undermined by Qualcomm's refusal to offer chipmakers a license to the Company's standard-essential patents.[44] In 2008, MediaTek requested that Qualcomm enter into a licensing agreement for Qualcomm's standard-essential patents relating to the WCDMA technologies. Qualcomm refused to make such an offer, and MediaTek was forced to accept, instead, a non-license arrangement. MediaTek soon discovered,

---

[44] MediaTek has been identified as "Company A" in the 2017 KFTC Final Decision. As with "Company A," MediaTek (i) was one of only a small number of companies in the 2G GSM chip business prior to 2008; (ii) began 3G GSM operations in 2009-2010; (iii) entered into a non-license arrangement with Qualcomm in 2009; and (iv) amended its agreement with Qualcomm in 2013.

however, that it "was impossible to fairly compete" without an actual license to Qualcomm's patents essential to the WCDMA technologies.

(b) Unable to compete without a license, MediaTek made "repeated requests" to Qualcomm in 2012 that it offer MediaTek a license agreement to its standard-essential patents. Qualcomm "again refused." In late 2012, MediaTek sent a letter to Qualcomm that cited the "unfair terms and conditions" in the parties' non-license arrangement and requested that the parties "enter into a license agreement under which [MediaTek] would pay royalties." Five months later, in early 2013, Qualcomm Vice President and Legal Counsel, Fabian Gonell, responded that Qualcomm "did not agree to enter into any license agreement with [Mediatek]."

(c) MediaTek again tried to obtain a license from Qualcomm in 2013, writing to Qualcomm and noting "the failure of [Qualcomm] to respond to [MediaTek]'s request to propose licensing terms and conditions and FRAND royalties" and "repeat[ing] its request [that Qualcomm] propose royalty rates and licensing terms and conditions." In its response, Qualcomm "repeatedly refus[ed] [MediaTek's] request to propose specific licensing terms and conditions and royalty rates," prompting MediaTek to write Qualcomm again to remind it "that [it] must enter into license agreements with those who have agreed to the FRAND terms with respect to standard-essential patents." MediaTek again specifically requested that Qualcomm "propose FRAND licensing terms and conditions." However, Qualcomm again responded that it had "no duty to grant a license" and would not negotiate a license agreement with MediaTek.

51

(d) Samsung also attempted to manufacture chipsets for sale, but was thwarted in its attempt by Qualcomm's refusal to license its standard-essential patents to chipset manufacturers.[45] On or about June 29, 2011, Samsung requested that Qualcomm offer it a license to the Company's essential patents. Qualcomm refused Samsung's request, "without any room for negotiations." Samsung soon recognized, however, that it was critical to obtain a license agreement from Qualcomm in order to maintain a "business [in] modem chipset sales." Indeed, when Samsung's modem chipset business division attempted to contact handset manufacturers to promote the sale of its chipsets, the handset manufacturers were reluctant to buy Samsung's chipsets because it had not obtained a license from Qualcomm to the essential patents. Accordingly, in 2012, Samsung again requested from Qualcomm a license to the standard-essential patents, but that request was similarly rejected. Due to Samsung's inability to obtain a license to the standardessential patents, Samsung "has not been able to initiate the business for sale of its modem chipset to handset manufacturers other than itself."

(e) Intel also tried to manufacture chipsets for sale, but Qualcomm's refusal to grant it a license to the standard-essential patents long prevented it from doing so.[46] In 2009, Intel requested from Qualcomm a license in order to manufacture and sell modem chipsets. The parties held two sets of negotiations in 2009, during which Qualcomm

---

[45] Samsung has been identified as "Company B" in the 2017 KFTC Final Decision. As with "Company B," Samsung (i) is the only company that operates as both an OEM and a chipset manufacturer; and (ii) entered into a licensing agreement in 1993 with Qualcomm that blocked Samsung from selling to other OEMs.

[46] Intel has been identified as "Company C" in the 2017 KFTC Final Decision. As with "Company C," Intel (i) is a chip company; and (ii) acquired a modem chipset manufacturer in 2011 (Infineon) that possessed an SEP licensing agreement.

would "not chang[e] its stance that [Qualcomm] could not grant a license to their patents for [Intel's] modem chipsets." As a result, the negotiations were unsuccessful.

(f) Via Technologies also attempted to enter the chipset manufacturing market, but was prevented from doing so by Qualcomm's anticompetitive behavior.[47] In early 2012, Via Technologies requested a license from Qualcomm for the patents essential to use its WCDMA standard. Qualcomm refused. Via Technologies then sent Qualcomm a written "request that [Qualcomm] comply with the FRAND commitment." As Via Technologies explained, Qualcomm's proposed, non-license arrangement "did not actually grant any rights to the standard-essential patents" to Via Technologies. Despite Via Technologies' repeated requests, Qualcomm continued to refuse to offer a license. As a result, Via Technologies has been unable to enter into the WCDMA-based modem chipset market.

(g) The KFTC further found that competitor chipset manufacturers made additional requests to Qualcomm for a license to its standard-essential patents, which Qualcomm also rejected. "Firmly following their business policy, [Qualcomm and its executives] refused to license their SEPs to modem chipset manufacturers." Due to this business policy, "no licensing agreement was entered into between [Qualcomm] and modem chipset manufacturers in order to manufacture and sell modem chipsets."

98.    The above facts identified above were not disputed and, in fact, "consistently admitted by the [Qualcomm] Respondents from the investigation stage," which began in August 2014, "through the deliberation" of the KFTC proceedings, which concluded in December 2016.

---

[47] Via Technologies has been identified as "Company D" in the 2017 KFTC Final Decision. As with "Company D," Via Technologies (i) is a chip company; (ii) obtained a CDMA 2000 license with Qualcomm based on its acquisition of LSI Logic's CDMA division; and (iii) was unable to enter successfully the WCDMAbased modem chipset market after 2012.

Professor Carrier agreed that, "[a]ccepting the KFTC's factual findings, Qualcomm violated FRAND by refusing to license to competitors."

99.     As the KFTC further discovered, Qualcomm's refusal to license the standard-essential patents to other chipset makers has stifled competition. Unable to obtain a license from Qualcomm, "competing chipset makers are subject to patent infringement attacks when they sell their chipsets to handset makers that have not entered in license agreements or that have disputes with Qualcomm." This makes it "difficult for the competing chipset makers [to] actively explor[e] markets as they can sell their products only to handset makers that have signed a license agreement with Qualcomm." In addition, "Qualcomm's practice of refusing to license to competing chipset companies has limited the competitors' customers and has created a structure in which Qualcomm can intervene in the transactions between the competitors and their respective customers."

100.    In refusing to license to competitors, the KFTC found that Qualcomm acted with "anti-competitive intent or purpose" and violated the anti-competitive laws. The evidence detailed in the Order reflected that Qualcomm "had the intention to restrict the competition and they were aware of it." The KFTC fined Qualcomm nearly a billion dollars and also enjoined it from refusing to offer licenses to chipset competitors going forward.

> **2.     FTC: Qualcomm Refused to License Competitors and Bundled Licenses and Chipset Deals**

101.    Beginning in September 2014, the FTC launched a rigorous two-and-a-half-year, non-public investigation into Qualcomm's anti-competitive business practices. The FTC has broad resources available to conduct its investigations and employed those resources in connection with its investigation of Qualcomm. Among other things, prior to bringing its

enforcement action, the FTC issued civil investigative demands for documents and took non-public testimony from several witnesses.

102.     The FTC brings an enforcement action in federal court to correct a company's anti-competitive practices only "when it has 'reason to believe' that the law has been or is being violated and it appears to the Commission that a proceeding is in the public interest."[48] After completing its exhaustive investigation, the FTC determined that it "has 'reason to believe' that the law has been or is being violated" by Qualcomm and filed an enforcement action on January 17, 2017, based on, among other things, Qualcomm having "consistently refused to license its cellular standard essential patents to its competitors, in violation of Qualcomm's FRAND commitments."[49] Consistent with the KFTC's findings, the FTC stated, based on its thorough investigation, that Qualcomm had refused to offer standard-essential patent licenses to competitor chip manufacturers, including Intel, MediaTek, and Samsung. By refusing to offer licenses to chipset manufacturers, Qualcomm "bolster[ed] its ability to maintain elevated royalties and other unreasonable license terms."[50]

103.     The FTC further identified how the Company offered customers "royalty relief" conditioned on their purchasing chipsets exclusively from Qualcomm. In other words, Qualcomm bundled its licenses to the standard-essential patents to the customers' agreement to buy Qualcomm chipsets. This use of "incentive payments helps Qualcomm 'close the gap' with

---

[48] FTC Press Release, "FTC Charges Qualcomm With Monopolizing Key Semiconductor Device Used in Cell Phones" (Jan. 17, 2017).
[49] FTC Complaint, No. 5:17-cv-00220-LHK (N.D. Cal. Jan. 17, 2017), ECF No. 1.
[50] The anti-competitive practices in the FTC's enforcement action were identified through its extensive investigation and confirmed by Lead Counsel's independent investigation, including, among other things, interviews of Qualcomm's former employees and current and former employees of Qualcomm's customers and competitors.

customers that resist license terms that they regard as unreasonable," and allows Qualcomm to "maintain high royalties on handsets that use competitors' baseband processors."

104.    The FTC described in detail how Qualcomm entered into a series of agreements with Apple, its largest customer, in which it conditioned billions of dollars of "royalty relief" payments on Apple's agreement to purchase Qualcomm chipsets. These agreements included:

- 2007 Qualcomm-Apple Agreement: Through the parties' 2007 agreement, Qualcomm effectively prohibited Apple from using the prospective fourth generation cellular standard WiMax, which was being promoted by Intel, one of Qualcomm's competitors at the time. Qualcomm was able to deter Apple from using its competitor's standard by including in the 2007 agreement a provision that conditioned CDMA royalty relief payments on Apple's agreement not to sell or license handsets that implemented the WiMax standard.

- 2011 Qualcomm-Apple Agreement: Qualcomm extracted additional anticompetitive concessions in its 2011 agreement with Apple, which were aimed at further deterring Apple from using Qualcomm's competitors' chipsets. Apple's agreement with Qualcomm required Apple to forfeit all royalty relief payments if, at any point between 2011 and 2016, Apple introduced a new handset that contained a competitor's chipset.[51]

- 2013 Qualcomm-Apple Agreement: Qualcomm continued to bundle its standard-essential patent licensing and chipset sales through its 2013 agreement with Apple, in which Qualcomm agreed to make substantial, annual payments to Apple in 2013, 2014, 2015, and 2016 that were expressly tied to Apple's agreement to purchase exclusively from Qualcomm all of its chipsets for new iPad or iPhone models. The 2013 Agreement again contained a forfeiture provision under which Apple would forfeit all royalty relief payments and could be required to refund all past payments if it ever used a competitor's chipset. The 2013 Agreement further provided that Apple would forfeit all future royalty relief payments and could be required to refund past payments if Apple either initiated or induced others to initiate an action challenging Qualcomm's licensing as unfair, unreasonable, or discriminatory.

105.    The FTC's enforcement action against Qualcomm is ongoing. On June 26, 2017, the District Court for the Northern District of California denied Qualcomm's motion to dismiss

---

[51] On December 8, 2015, the European Commission announced its "preliminary conclusion that [Qualcomm] illegally paid a major customer for exclusively using Qualcomm chipsets" since 2011. In its January 20, 2017 filing in this District, Apple identified itself as the "major customer."

the enforcement action. In finding that the FTC stated an antitrust claim, the Court agreed that "Qualcomm had an antitrust duty to license its FRAND-encumbered SEPs to its competitors," and "Qualcomm's refusal to deal with its rivals, in violation of its FRAND commitment, was motivated by 'anti-competitive malice.'" The Court further found that the FTC had adequately stated "that Qualcomm's exclusive dealing arrangements with Apple violated the Sherman Act."

### 3. Industry Participants: Qualcomm Refused to License Competitors and Bundled Licenses and Chipset Deals

106.    Major industry participants have further confirmed that Qualcomm refused to offer licenses to its competitors and drove out competition by bundling the terms of its licenses and chipset-sale agreements.

107.    Mr. Wei-Fu Hsu served in the role of General Counsel for MediaTek between September 2008 and his retirement in August 2016. Prior to that time, between 2004 and September 2008, he was the chief legal officer of MediaTek, in charge of all MediaTek legal matters, and reported directly to the CEO and Chairman. Before joining MediaTek, Mr. Hsu practiced law at several large international law firms, including Jones Day, Bingham McCutchen, Hogan & Hartson (now Hogan Lovells), and Fulbright & Jaworski (now Norton Rose Fulbright), and was a senior circuit design engineer at National Semiconductor Corporation. Mr. Hsu was named among the top 100 most influential and innovative in-house counsels in the Asia Pacific by Legal 500, and was named the 2015 IAM Strategy 300 by the IAM magazine. The Financial Times named Mr. Hsu among the Asia-Pacific Innovative General Counsels in 2015. Mr. Hsu also won the Silver Award 2016 of the Best Asian & South Pacific Legal Department from the International Legal Alliance. Mr. Hsu received his B.S.E.E. from National Cheng Kung University, M.S.E.E. from San Jose State University, and J.D. from

University of Washington. Mr. Hsu is licensed to practice law in Washington and California, as well as before the United States Patent and Trademark Office.

108.    As MediaTek's general counsel, Mr. Hsu was personally involved in MediaTek's negotiations with Qualcomm before and during the Relevant Period. Over that period, MediaTek repeatedly requested, and was consistently denied, a license for Qualcomm's standard-essential patents for WCDMA and other mobile communications technologies. Mr. Hsu explained that, during the Relevant Period, Qualcomm "refused to license any of [its] patents to MediaTek" or, to his knowledge, any other chipset manufacturer.

109.    Consistent with the KFTC's findings, Mr. Hsu explained that Qualcomm also earned higher profits by licensing exclusively to handset manufacturers. Mr. Hsu stated that Qualcomm "can collect a lot more money from a phone maker than a chipmaker." By licensing to handset makers, and not chipset manufacturers, Qualcomm "can charge [a royalty rate] based on the full price of the phone," rather than the price of the chip. Based on his knowledge of industry practice through his 25 years of experience, Mr. Hsu explained that, to his knowledge, Qualcomm is the only chipmaker in the cellular industry that has a policy of refusing to license its standard-essential patents to other chipmakers.

110.    Again consistent with the KFTC's findings, Mr. Hsu further explained how MediaTek attempted to obtain a license to Qualcomm's standard-essential patents for many years, beginning in approximately 2008. The first set of negotiations between MediaTek and Qualcomm lasted more than a year, and included senior executives in the Company's QTL division. As the most senior member of MediaTek's legal team, Mr. Hsu led the negotiations and played an active and direct role in MediaTek's efforts to obtain a license to Qualcomm's standard-essential patents. Mr. Hsu stated that he participated in "regular meetings every two to

three weeks" with the Qualcomm QTL executives. During those negotiations, Qualcomm said, in words or substance, "We are not going to license you."

111.    In late 2012, Mr. Hsu sent a letter to Qualcomm that specifically requested that the parties negotiate a license agreement. The letter "specifically demand[ed] patent license negotiations," Mr. Hsu explained. Qualcomm waited several months to respond to Mr. Hsu's letter. Eventually, however, Qualcomm responded, and the parties started in early 2013 to negotiate a new arrangement. Mr. Hsu stated that during the beginning of the parties' negotiations "we did raise this request for a license several times." Qualcomm, however, refused to offer a license, insisting upon another, more limited, type of arrangement.

112.    Additionally, Mr. Hsu explained that Qualcomm also curbed competition by providing its chipset customers with royalty relief if they largely or exclusively purchased Qualcomm chipsets, rather than MediaTek's or another competitor's chipsets. Mr. Hsu described, consistent with the FTC, how Qualcomm agreed to reduce customer royalty rates if the customers purchased their chipsets from Qualcomm, rather than other chipset manufacturers. As Mr. Hsu explained, these were "secrets in the industry."

113.    Mr. Hsu confirmed that he heard from multiple companies during the 2012 to 2013 timeframe, including Huawei, ZTE, and certain other handset manufacturers, about the incentive concept—that if they wanted a royalty reduction, they had to buy Qualcomm chips. Mr. Hsu explained that, through its bundling of chip sales and the terms of its license agreements, Qualcomm would "use rebates as bait for more cooperation with customers." As Mr. Hsu further stated, "[i]t's how they are so successful: they are basically wielding their dominant power in chips, and also wielding dominant power in the essential IP portfolios to gain additional advantages in their business practice."

114.    After reviewing the KFTC's order, Mr. Hsu confirmed that KFTC's findings related to MediaTek were correct and consistent with his best recollection.

### a.    Motorola

115.    Qualcomm's refusal to license to its competitors was further corroborated by a senior, former in-house Motorola commercial lawyer from at least January 2014 through the end of 2015 who was personally involved in Motorola's license negotiations with Qualcomm. The Motorola lawyer participated in dozens of meetings with Qualcomm, with regular interactions with Fabian Gonell and other interactions with his superior, Defendant Aberle, when a matter would escalate to his level. As the Motorola lawyer explained, "[a]ny document that was negotiated with Qualcomm" from at least January 2014 through the end of 2015 "I was pretty much the one negotiating it."

116.    When the former senior Motorola lawyer was questioned whether Motorola was aware that Qualcomm did not license to competing chipset makers, the Motorola lawyer said, "Yes, definitely. MediaTek, Intel – we tried to work with all of them, but you always had to come back to Qualcomm, because [Qualcomm's refusal to license to competitors] kept anybody else from developing in that space, so we never really had viable options." The former Motorola lawyer "kn[e]w Intel tried many times" to obtain a license to Qualcomm's essential patents and spoke to Intel about it, with Intel confirming that "Qualcomm refused to license to them." The Motorola lawyer spoke to about five different people at Intel about this issue, including a senior in-house lawyer in Intel's Patent and Standards group throughout the Relevant Period.

117.    The former Motorola lawyer, whose responsibilities included negotiating with Qualcomm, explained how Motorola complained to Qualcomm "constantly" about its refusal to license to competitor chipmakers. "Our CEO would meet with them and tell them we were sick

of how they were doing things," the Motorola lawyer explained. The Motorola lawyer recalled that "we had many escalation meetings with [Defendant] Mollenkopf," and that Motorola's then-CEO complained to Qualcomm's CEO at the time, Defendant Mollenkopf, about the Company's refusal to license to chipset competitors. The Motorola lawyer attended many meetings with Qualcomm during its negotiations with Motorola and was generally involved in the preparation of Motorola's presentation materials for highlevel executive meetings with Qualcomm. As the Motorola lawyer explained, in its "quarterly business reviews" used during the high-level executive meetings during 2014 through the end of 2015, Motorola included a list of "our grievances" that usually included a reference to Qualcomm's refusal to license to competitors. The Motorola lawyer believes that, in addition to Defendant Mollenkopf, Defendant Aberle also attended the meetings during which these presentation materials were provided.

### b.   Samsung

118.    Samsung has also publicly confirmed that Qualcomm refused its requests to grant it a license due its status as a competitor chip manufacturer. On May 12, 2017, Samsung filed an amicus brief in California federal court in support of the FTC's enforcement action against Qualcomm. In it, Samsung stated that it had "ongoing firsthand experience with the impact of Qualcomm's conduct on chipset competitors." Samsung explained that it manufactured its own line of chipsets (called the "Exynos chipsets"), which Samsung sought to sell to third parties. But as Samsung explained, "[d]espite having requested a license from Qualcomm, Samsung cannot sell licensed Exynos chipsets to non-Samsung entities because Qualcomm has refused to license Samsung to make and sell licensed chipsets." Samsung further stated that Qualcomm has "acknowledge[d] this policy of refusing to license potential competitors." Samsung concluded

that it "has directly experienced, and been directly harmed by, [Qualcomm's] exclusionary conduct."

### c.    Intel

119.    Intel has also publicly confirmed that Qualcomm refused its requests for a license due its status as a competitor chip manufacturer. On May 12, 2017, Intel submitted an amicus brief in support of the FTC's federal lawsuit against Qualcomm. In it, Intel explained that, "[a]s a competitor in the premium cellular chipset market, Intel has seen firsthand the harm caused by the anti-competitive conduct described in the FTC's complaint." As Intel explained, "for years Qualcomm has maintained an interlocking web of abusive patent and commercial practices that subverts competition on the merits. These practices have coerced mobile-phone manufacturers … into purchasing the chipsets they need from Qualcomm and Qualcomm alone." Intel further stated that "[t]he FTC's allegations of anti-competitive conduct reflect the reality that Intel has experienced in the marketplace." Specifically, Intel confirmed that Qualcomm has "refuse[d] to license [to] competitors," including Intel. As Intel explained, "[b]y refusing to license [to] competitors and by coercing customers into exclusivity deals, Qualcomm fences other chipset manufacturers out of the market."

120.    Apple designs and manufactures mobile devices and is Qualcomm's single largest chipset customer, singlehandedly comprising 30% of Qualcomm's total earnings. Over the past few years, Apple has privately warned Qualcomm, including Defendant Aberle, that Qualcomm has improperly set "royalties based on an illegal manipulation of the market for cellular enabled chips." As Mr. Bruce Sewell, Senior Vice President and General Counsel of Apple, recounted to Defendant Rosenberg in correspondence, Apple cautioned Qualcomm and Defendant Aberle "at

various times in the past few years" that it would stop remitting royalties to Qualcomm due its anti-competitive misconduct. As Mr. Sewell wrote:

> As you may have already heard from our contract manufacturers, Apple has not remitted funds to those contract manufacturers for royalty payments for the quarter ending March 31, 2017. This should come as no surprise to Qualcomm. Derek [Aberle] and I have discussed this eventuality at various times in the past few years. Qualcomm's refusal to license on a fair, reasonable, non-discriminatory basis is harming not only Apple, but our contract manufacturers, other chipset companies and the wider industry. We believe Qualcomm is charging the contract manufacturers, who in turn pass back to Apple and its customers, royalties based on an illegal manipulation of the market for cellular enabled chips…. Qualcomm's refusal to meet its FRAND commitments and its insistence on taxing our innovation is both illegal and anticompetitive. We cannot support this behavior.[52]

121.    Qualcomm's bundling of the terms of its licensing and chipset agreements was also documented in Apple's January 20, 2017 filing in this District, and subsequent amendment (the "Apple Complaint"), as well as its May 19, 2017 Particulars of Claim in the High Court of Justice in London, England.[53] Therein, Apple explained, consistent with the FTC, that Qualcomm's January 8, 2007 agreement with Apple, titled the "Marketing Incentive Agreement," prohibited Apple from marketing wireless devices using the WiMAX standard, which was the prospective 4G standard endorsed by Qualcomm's rival chip manufacturer, Intel. In exchange for its acceptance of this agreement not to use the standard used for Intel's chips, Apple received a reduced royalty rate from Qualcomm.

122.    Apple also publicly confirmed, consistent with the FTC, that its February 11, 2011 agreement with Qualcomm, titled the "Transition Agreement," provides Apple with royalty

---

[52] Letter from B. Sewell to D. Rosenberg, dated April 25, 2017.
[53] Apple and its counsel confirmed that they stand by the factual statements and allegations in their amended complaint against Qualcomm filed in this District, which was the product of their investigation and review of underlying documents in Apple's files. In addition, Apple's Particulars of Claim, filed on May 19, 2017, which contains the same factual assertions relevant here, was supported by a "Statement of Truth," in which Apple and its counsel verified that "believes that the facts stated in this Particulars of Claim are true."

relief on CDMA-standard iPhones so long as Apple exclusively uses Qualcomm's chipsets. As Apple has now explained, since 2011 "Qualcomm has conditioned billions of dollars in rebates on exclusivity or de facto exclusivity from Apple." The "sole purpose of these [rebate] payments was to reduce Apple's royalty burden in exchange for exclusivity." Apple has further publicly acknowledged, again consistent with the FTC, that Qualcomm, under its January 1, 2013 amendment to the Transition Agreement, makes royalty relief payments to Apple that are conditioned on Apple's exclusive use of Qualcomm chipsets, as opposed to a competitor's chipsets.

123.    Apple has further claimed that, in January 2013, it entered into a Business Cooperation and Patent Agreement (the "BCPA") with Qualcomm that provided additional royalty incentives to Apple. These incentive payments are expressly provided for in Sections 7 and 8 of the BCPA and require Qualcomm to make quarterly, lump-sum payments to Apple that effectively reduce Apple's per-device royalty payment for each iPhone and iPad sold between 2013 and 2016. In the second paragraph of Section 7 of the BCPA, Qualcomm conditioned these royalty relief payments on Apple's agreement not to initiate or induce any legal action that, among other things, "claims that Qualcomm failed to offer a license to its SEPs on FRAND terms." As Apple has publicly explained: "[I]n restraining Apple from initiating action or bringing concerns to law enforcement, Qualcomm conditioned billions of dollars on Apple's silence before courts and regulators about Qualcomm's business practices."

124.    Apple received quarterly royalty relief payments from Qualcomm under the BCPA from 2013 through mid-2016 totaling billions of dollars. Beginning in mid-September 2016, however, Qualcomm refused to make any additional royalty relief payments to Apple because Apple had provided damaging testimony to the KFTC that helped expose certain of

Qualcomm's anti-competitive licensing practices. Qualcomm specifically told Apple that it "'will not make any further BCP Payments to Apple,'" including the nearly $1 billion in royalty relief presently owed, due to "'legal issues'" regarding Apple's interactions with the KFTC and other anticompetition agencies.

125.   Furthermore, Qualcomm eventually proposed to pay Apple the nearly $1 billion in royalty relief owed if, according to Apple, it would "recant[] its true and, in many cases, sworn testimony before government agencies and instead g[i]ve false testimony favorable to Qualcomm." Indeed, Qualcomm sent Apple a letter on December 2, 2016, in which Qualcomm specifically conditioned payment of the nearly $1 billion in royalty relief owed to Apple upon Apple's agreement to "'publicly and specifically retract and correct'" statements Apple made to regulatory agencies concerning Qualcomm's anti-competitive practices.

126.   A former senior member of Apple's Patent Licensing & Strategy department during the Relevant Period until June 2015, whose responsibilities included directing Apple's strategies for negotiations and technology transactions, has confirmed that he read the Apple Complaint, and that the allegations therein are consistent with what he knew from his tenure at Apple. He explained that it was known at Apple that Qualcomm had a royalty rate that is "exorbitant" for the license itself, but that there were ways for a customer to offset that through a chipset deal with Qualcomm. He explained that everybody who had a deal with Qualcomm on a substantial level had to navigate this structure that Qualcomm "imposed" on the industry, continuing:

> I do say imposed because you either needed the chips or needed a patent license, and if you needed chips you needed both. So it was like everyone had to deal with it on one level or another. And the fact that Qualcomm could reap more for patent licenses from people who weren't buying chips or weren't willing to do squirrely things with them, that wasn't right under FRAND.

127.    According to the former senior member of Apple's Patent Licensing & Strategy, there were various "structures" and "mechanisms" by which Qualcomm provided royalty rebates tied to chipset purchases. The former senior member of Apple's Patent Licensing & Strategy explained that "[y]ou can structure the deal so that you pay some amount for chips, but if you buy 'x' number of chips over so many years, Qualcomm will give you something else and that will offset what you have to pay for the license." The former senior member of Apple's Patent Licensing & Strategy department noted that there may be "complexities to the transaction," including whether it's called a "royalty rebate" or by "some other name," but "I've never heard anyone in the industry suggest that the purpose of that was anything other than 'Jesus, we're not going to pay 'x' amount for this license – we got to find another way to effectively have it not cost us that much."

### d.    Qualcomm

128.    A former Qualcomm Vice President of Technology, who worked at the Company in various positions for over twenty years, including through the start of the Relevant Period until August 2015, had experience working with QCT Finance, as well as identifying customers and having them sign up for Qualcomm's chipsets, and was senior enough at Qualcomm to observe its general licensing practices.[54] He explained that, when making chipset agreements with customers, "there was always a QTL component that would act in the background." He also

---

[54] The former Vice President of Technology held multiple, high-level positions at Qualcomm during his over twenty years with the Company, which included over ten years as a Vice President. In his last role, from September 2014 through August 2015, he was a Vice President of Technology of Qualcomm Atheros. In addition, between 2009 and 2011, he was the Vice President of Engineering of AST located in San Diego, which was part of QCT, the chip division. In that role, he identified synergies between cost constraints, customer needs, and QCT's next generation solution and also worked with design, engineering and finance teams to enable them to meet customer targets on costs. Also in that role, he led negotiations with U.S. and international network carriers.

explained that QTL, in fact, "had to" be involved. "If we were discussing some rebate or something, QTL was there."

129.    The former Qualcomm Vice President of Technology further explained: "If Qualcomm made a sale to a customer who took the complete chipset, and the volume is huge, then there are incentives saying, 'If you use our QCT chipsets, our complete solution, then the licensing agreement will be different, and there will be some rebates you have when you reach a milestone.' Compared to, if you don't use our chipset…" The milestone could be purchase volume or purchases over a certain length of time. When asked about who was involved in these negotiations and discussions, he said, "There is a whole QTL licensing team, along with [QCT] Finance, that goes and tries to negotiate the price of the chipset with customers. It's not fixed. Based on volume, you get discounts. Based on technology, you get discounts."

130.    The former Vice President of Technology explained that the proposal to the customer was, "Take our chipset and later on there would be some kind of rebate or something applied if the complete solution [chipset plus licensing] is applied." He said, "One portion of the business is chipsets; the other portion is royalty after the chipset gets sold." But he added, "It's tied together." He explained, "QCT Finance also needs to make sure there are conditions created so that chipset sales are incentivized for newer technologies, so Qualcomm can get more royalties."

###    F.    Regulators and Investors Respond to Qualcomm's Anti-Competitive Conduct

131.    Defendants' anti-competitive conduct—their refusal to license competitors and their bundling of licenses and chipset agreements—has been exposed through the revelation of a series of regulatory investigations and findings around the world, an enforcement action by the

FTC, and a multi-billion dollar action by Qualcomm's largest customer. These revelations have also caused substantial losses for Qualcomm's investors.

132.    First, on November 17, 2015, Qualcomm announced that the KFTC had issued its Case Examiner's Report. The Case Examiner's Report stated that Qualcomm suppressed market competition by excluding competitors. In response to the news, Qualcomm's stock price fell by 9.4% in a single trading day. As Investor's Business Daily recounted that day, "[s]hares of wireless chip giant Qualcomm (QCOM) plunged 9.4% to $48, its lowest point in more than 4 years, after S. Korea's Fair Trade Commission said the San Diego-based company violated local competition laws with its patent licensing practices."[55] On November 20, 2015, Forbes similarly stated that the news "had sent investors panicking and the company's stock dropped 10% -- the lowest it's been in the past four years."[56] Analysts at Bernstein Research stated that the "allegations in the report are troubling.... The Case Examiner's report sheds some troubling light on the details of the complaint."[57]

133.    Second, on December 8, 2015, it was announced that both the Taiwan FTC and European Commission had taken regulatory action against Qualcomm. Specifically, Qualcomm revealed that the Taiwan FTC requested information from the Company and initiated an investigation into whether the Company's patent licensing arrangements violate the Taiwan Fair

---

[55] Investor's Business Daily, "S. Korea Accuses Qualcomm" (Nov. 17, 2015).

[56] Aaron Tilley, Forbes, "Qualcomm's Biggest Profit Engine Faces More Pressure" (Nov. 20, 2015).

[57] U-Jin Lee, TheStreet.com, "Qualcomm (QCOM) Stock Hammered, South Korea Alleges Illegal Patent Licensing Practices" (Nov. 18, 2015).

Trade Act.[58] The Taiwanese authorities also notified Qualcomm that they were looking into whether "the Company violated a FRAND licensing commitment by declining to grant licenses to chipset makers" and "the Company provided royalty rebates to certain companies in exchange for their exclusive use of the Company's chipsets."[59] Also on December 8, 2015, the European Commission announced that it had informed Qualcomm of its preliminary finding that the Company illegally compensated a major customer, later identified as Apple, in exchange for its exclusive use of Qualcomm chips, thus violating European Union antitrust laws.

134.    In response to these revelations, Qualcomm's stock price sank further, declining an additional $2.67 per share. Discussing the Taiwan FTC and European Commission investigations and findings, analysts at The Motley Fool stated that "Qualcomm investors recently received a double dose of bad news."[60]

135.    Third, on December 27, 2016, the KFTC further exposed Qualcomm's misconduct when it confirmed the Case Examiner's findings and issued an $853 million fine against Qualcomm. The fine was the single largest fine ever administered by a Korean regulator, and one of the largest fines ever administered against a cellular telecommunications company by any governmental authority. The KFTC also ordered Qualcomm, going forward, to offer competitor chipmakers licenses in accordance with the Company's FRAND commitment. The misconduct identified by the KFTC, and discussed above, stunned industry participants, further

---

[58] The Taiwan FTC investigates and enforces Taiwan's competition laws, and initiates an investigation when it believes that the Taiwan Fair Trade Act has been violated. As part of its investigation, the Taiwan FTC sent a letter to Qualcomm inquiring into the Company's patent licensing arrangements.

[59] Qualcomm Inc., SEC Form 10-Q dated April 19, 2017.

[60] Leo Sun, The Motley Food, "Qualcomm Inc. Faces More Antitrust Challenges in Europe and Taiwan" (Dec. 12, 2015).

devaluing Qualcomm's stock. For example, the publication Patent Progress issued a report describing how:

> The Korean Fair Trade Commission ('KFTC') has just taken extreme action against Qualcomm for anti-competitive practices. The KFTC fined Qualcomm about $850 million and ordered it to change the way it licenses its standard-essential patents. Why did the KFTC do this?
>
> Well, Qualcomm breaks its commitments to standard setting organizations, strong-arms its customers into giving free cross-licenses, and blocks competitors from entering its chip market.[61]

The report further highlighted how the KFTC found facts "show[ing] a deliberate (and successful) attempt to monopolize the CDMA chip market using its CDMA-essential patents." The report continued that "Qualcomm refuses to license other chip manufacturers" because "[a]pparently, Qualcomm determined that it would be difficult to remain profitable in the CDMA market if it did license other chip manufacturers."

136.    Fourth, on January 17, 2017, the FTC filed an enforcement action based on, among other things, Qualcomm's "refusal to license standard-essential patents to competitors" and its demanding "exclusivity from Apple in exchange for reduced patent royalties." In response to these revelations, Qualcomm's stock price sank further, declining an additional $2.48 per share. As The Street reported that day, "[t]he news sent Qualcomm shares sharply lower by 4% to $64.19 on Tuesday on fears of damage to its lucrative business model."[62] Analysts at Seeking Alpha similarly stated that Qualcomm "lost roughly $20bn in market cap in just a few days after the announcement.... In our discussion with analysts and legal experts, Qualcomm's

---

[61] Matt Levy, Patent Progress, "KFTC Takes Action Against Qualcomm" (Jan. 5, 2017).

[62] Annie Palmer, TheStreet, "The FTC Rocks Qualcomm" (Jan. 17, 2017).

licensing business model and potentially a portion of QCT is perceived to be in jeopardy."[63] Analysts at The Motley Fool likewise commented that "Qualcomm brushed off these accusations, but the stock's performance following the news shows that investors don't share the same confidence."[64]

137.    Finally, Qualcomm's anti-competitive conduct was further exposed through a major lawsuit by Qualcomm's largest customer, Apple. On January 20, 2017, Apple initiated a federal court action against Qualcomm, which further detailed the Company's abuses of monopolistic power through its refusal to license competitors and its exclusivity contracts that prohibited Apple from purchasing chips from competitors. In addition, the action disclosed that Qualcomm owed Apple over a billion dollars in royalty relief rebates, which Qualcomm withheld in response to Apple's testimony to the KFTC. On the same day it filed its lawsuit, Apple issued the following statements:

> Qualcomm built its business on older, legacy, standards but reinforces its dominance through exclusionary tactics and excessive royalties. Despite being just one of over a dozen companies who contributed to basic cellular standards, Qualcomm insists on charging Apple at least five times more in payments than all the other cellular patent licensors we have agreements with combined.
>
> To protect this business scheme Qualcomm has taken increasingly radical steps, most recently withholding nearly $1B in payments from Apple as retaliation for responding truthfully to law enforcement agencies investigating them.[65]

138.    The news of Apple's revelations further surprised investors, with the financial press reporting that investors were "spooked."[66] Analysts at Bernstein Research responded,

---

[63] CDM Capital, Seeking Alpha, "Qualcomm: A Cheap Stock In An Expensive Market" (Apr. 11, 2017).

[64] Timothy Green, The Motley Fool, "Qualcomm Reports Sluggish Growth as Lawsuits Loom" (Jan. 26, 2017).
[65] Susan Decker, Alex Webb, Ian King, Bloomberg, "Apple Sues Qualcomm Over Patent Royalties in Antitrust Case" (Jan. 20, 2017).

downgrading Qualcomm's stock and warning investors to "[e]xpect overhang from what appears to be an all-out attack on the business model from both regulators and largest customers [which] will remain for quite some time."[67] Following the revelations contained in the Apple action, Qualcomm's stock price plummeted over 12% on particularly high trading volume.

139.    With each of these revelations, investors lost billions of dollars in market value. In total, investors suffered over $32 billion in market capitalization losses as a result of the disclosures discussed above.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

140.    Defendants materially false and misleading statements during the Relevant Period included, among other things:

(i) Defendants represented to investors that Qualcomm made its standard essential patents "available to the industry through its licensing program" on a "non-discriminatory" basis when, in reality, Qualcomm refused to license competitor chipmakers;

(ii)    Defendants represented to investors that Qualcomm's "patent licensing practices" had been "maintained for almost two decades" when, in reality, Qualcomm materially altered its licensing practices in 2008, creating significant business and regulatory risks;

(iii)    Defendants represented to investors that Qualcomm's "patent licensing practices" had been "maintained for almost two decades" when, in reality, Qualcomm materially altered its licensing practices in 2008, creating significant business and regulatory risks;

(iv)    Defendants represented to investors that Qualcomm adopted a "procompetitive" licensing model that "facilitated competition" when, in reality, Qualcomm instituted a business model and implemented a set of licensing policies that stifled and blocked competition, enabling it to achieve market dominance.

141.    Defendants also omitted material facts when speaking to investors during the Relevant Period including, among other things, that Qualcomm: (i) refused to license to

---

[66] Aaron Pressman, Fortune, "Qualcomm Blasts Apple Over Alleged Chip Manipulations" (Apr. 10, 2017).
[67] Tiernan Ray, Barron's, "Qualcomm Plunges: Bad News When Your Top Customer Sues You, Says Bernstein" (Jan. 23, 2017).

competitor chipmakers, including MediaTek, Samsung, Intel, and Via Technologies; (ii) bundled the terms of its chipset and license agreements by, among other things, providing handset manufacturers royalty relief conditioned on their exclusive use of Qualcomm chips; and (iii) amended its licensing policies in 2008 by refusing to license to competitors.

142.    During 2012, Qualcomm issued three quarterly reports with the SEC on Form 10-Q, each of which was signed by Defendant Jacobs. These quarterly reports, which were filed on February 1, April 18, and July 18, 2012, touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

143.    The above statements identified were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard. The above statements also omitted material facts when made, including that: (i) Qualcomm maintains a policy by which it refuses to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm stifled competition by bundling the terms of its chipset and license agreements, conditioning royalty relief on customer's exclusive use of Qualcomm chipsets.

144.    On April 11, 2012, Defendant Rosenberg was quoted in an article entitled "The Evolution of Technology Markets: Separating Fact from Fiction." In the article, Defendant Rosenberg touted, and purported to describe, "Qualcomm's business model." Specifically, the

article quoted Defendant Rosenberg as stating "Qualcomm's business model—broadly licensing our technology and reinvesting in R&D—is enabling the success of many other companies in the wireless value chain."

145. Defendant Rosenberg's statement above was false and misleading when made. Contrary to Defendant Rosenberg's representation that the "Qualcomm business model" was to "broadly license [its] technology," Qualcomm refused to license its technology to an entire segment of the industry— namely, its competitor chipset manufacturers. The statement identified above also omitted material facts when made, including that: (i) Qualcomm revised its licensing model in 2008 and, after that point, maintained a policy that refuses to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

146. On April 26, 2012, Qualcomm presented at a House Hearing before the Subcommittee on Intellectual Property, Competition and the Internet of the Committee on the Judiciary House of Representatives. During its prepared remarks during an open session, Qualcomm, through Sean Murphy, Vice President and Counsel of International Government Affairs, stated that "Qualcomm's business model concentrates on two key areas," one of which was that "we broadly license our portfolio of U.S. and foreign patents to virtually every manufacturer in the mobile industry."[68]

---

[68] Sean Murphy was Qualcomm's Vice President and Counsel of International Government Affairs throughout the Relevant Period. In this role, he "manage[d] a range of international public policy issues for Qualcomm, including intellectual property, international trade, and innovation policy." Murphy left Qualcomm in May 2017. Throughout the Relevant Period, Murphy spoke on behalf of Qualcomm numerous times, holding himself out as someone with intimate knowledge about the Company's business practices. Murphy testified before the U.S. Congress on Qualcomm's behalf at least three times during the Relevant Period.

147.    The above statement was materially false and misleading when made. Rather than "broadly license [its] portfolio of U.S. and foreign patents to virtually every manufacturer in the mobile industry," Qualcomm refused to license its patents to an entire segment of the industry—namely, its competitor chipset manufacturers. The above statement also omitted material facts when made, including that: (i) Qualcomm maintained a policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

148.    On November 7, 2012, Qualcomm filed its annual report with the SEC for the fiscal year 2012 ("2012 Form 10-K"), which was signed by Defendant Jacobs. In the 2012 Form 10-K, Qualcomm stated that it had "committed to [the] standards bodies that we will offer to license our essential patents for these CDMA standards on a fair and reasonable basis free from unfair discrimination." Qualcomm further represented that "[w]e have licensed or otherwise provided rights to use our patented technologies to interested companies on terms that are fair, reasonable and free from unfair discrimination."

149.    The above statements were materially false and misleading when made. Qualcomm has not "licensed or otherwise provided rights to use [its] patented technologies to interested companies on terms that are fair, reasonable and free from unfair discrimination." Rather, the Company has discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers, as well as discriminated against licensees by providing royalty relief to customers who agreed to purchase exclusively Qualcomm chipsets. The above statements also omitted material facts when made, including that: (i) Qualcomm maintains a policy in which it refuses to license the standard-essential patents to competitor

chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

150.   Qualcomm's 2012 Form 10-K also purported to describe the Company's contribution to "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing and enabling a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to chipset manufacturers its patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

151.   Qualcomm's 2012 Form 10-K also touted, and purported to describe, the Company's licensing strategy, stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was materially false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers. This statement also omitted material facts when made, including that: (i) Qualcomm maintained a policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm

76

has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

152.    On November 27, 2012, Defendant Aberle addressed investors at the Credit Suisse Technology Conference in Scottsdale, Arizona. During the investor conference, Defendant Aberle assured investors:

> And within the Company, we tend to keep the licensing and the chip business very separate. Obviously, our view is that companies need a license if they are doing 3G or 4G devices, sort of irrespective of whose chip they use. And we try to keep that separated from whether they are using a QRD or a Qualcomm chip, and we don't bundle those together.

153.    The above statements were false and misleading when made. Contrary to Defendant Aberle's statement, Qualcomm did not keep the "licensing and chip business very separate"; rather, it refused to license competitor chipmakers and bundled the terms of its license and chip agreements. The above statements also omitted material facts, including that: (i) Qualcomm maintained a policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm bundled the terms of its license agreements with the terms of its chipset agreements by providing royalty relief to Apple and other customers who purchased all or most of their chipsets from Qualcomm.

154.    During 2013, Qualcomm issued three quarterly reports with the SEC on Form 10-Q, each of which was signed by Defendant Jacobs. These quarterly reports, which were filed on January 30, April 24, and July 24, 2013, touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

155.    The above statements were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard. The above statements also omitted material facts when made, including that: (i) Qualcomm maintained a policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm stifled competition by bundling the terms of its chipset and license agreements, conditioning royalty relief on the customer's exclusive use of Qualcomm chipsets.

156.    On February 25, 2013, Defendants Mollenkopf, Aberle, and Jacobs made an investor presentation at the GSM Association Mobile World Congress. When questioned by Mark McKechnie of Evercore about Qualcomm's chip and licensing business, Defendant Mollenkopf stated the following: "Well, they are really separate businesses. I mean we have been very clear that we keep those two things separate -- separate propositions to the customer. So, really two different things."[69]

157.    The above statements were false and misleading when made. Contrary to Defendant Mollenkopf's statement, Qualcomm did not keep the licensing and chip business "really separate," and the terms of the agreements were not "separate propositions to the

---

[69] Transcript, "Qualcomm at GSM Association Mobile World Congress" (Feb. 25, 2013). The transcript reflects that the question was inaudible to the transcriber. Mark McKechnie, the Evercore analyst, has explained that based on Mollenkopf's response to his question, the context, and McKechnie's focus at the time, his best recollection, although he did not remember exactly, is that his question that prompted Defendant Mollenkopf's answer concerned the "strategic benefits of having the royalty and chip business under the same roof."

customer." Rather, Qualcomm refused to license competitors to its chipset business and bundled the terms and negotiations of its license and chipset agreements.

158.    Defendant Mollenkopf's statements above also omitted material facts, including that: (i) Qualcomm bundled the terms of its license agreements with the terms of its chipset agreements by providing royalty relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm; (ii) Qualcomm's business and licensing model included refusing to license its patents essential to the cellular standards to competitor chipset manufacturers; and (iii) consistent with its business and licensing model, Qualcomm refused to license its patents essential to the cellular standards to competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.

159.    On March 5, 2013, Defendants Jacobs, Rosenberg, Mollenkopf, and Aberle addressed investors at Qualcomm's 2013 Annual Meeting of Stockholders. During his opening remarks, Defendant Jacobs discussed the Company's "record revenues," which he attributed to its purported business model of "licens[ing] broadly," explaining:

> [O]ne of the things that we've really focused on was making sure that we license broadly, that we were seen as a company who is an enabler for the rest of the industry, and so we aren't seen as a tax collector but we're seen as an R&D engine, an innovation engine that helps our partners grow their businesses and it's worked extremely well.

160.    Defendant Jacobs' above statements were materially false and misleading when made. Contrary to Defendant Jacobs' statement that Qualcomm focused on "making sure that we license broadly" and is "seen as a company who is an enabler for the rest of the industry," Qualcomm took affirmative steps to refuse to license its essential patents to an entire segment of the industry— namely, competitor chipset manufacturers. The above statements also omitted material facts when made, including that: (i) Qualcomm's business and licensing model included

refusing to license its patents essential to the cellular standards to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, refused to license its patents essential to the cellular standards to competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.

161.    On November 6, 2013, Qualcomm filed its annual report with the SEC for its fiscal year 2013 ("2013 Form 10-K"), which was signed by Defendant Jacobs. In the 2013 Form 10-K, Qualcomm stated that it had "committed to [the] standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." Qualcomm further stated that "[w]e have licensed or otherwise provided rights to use our patented technologies to interested companies on terms that are fair, reasonable and nondiscriminatory."

162.    The above statements were false and misleading when made. Qualcomm has not licensed "interested companies on terms that are fair, reasonable and non-discriminatory." Rather, the Company has discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers, as well as discriminated against licensees by providing royalty relief to customers who agreed to purchase exclusively Qualcomm chipsets. The above statements also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

163.   Qualcomm's 2013 Form 10-K also purported to describe its contribution to "Competition," stating that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to chipset manufacturers its patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

164.   Qualcomm's 2013 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its global rival chipset manufacturers. This statement also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

165.   On November 6, 2013, Qualcomm and Defendant Mollenkopf held an investor conference call to discuss the Company's results for the fourth quarter and full year of 2013.

During his opening remarks, Defendant Mollenkopf purported to describe and touted Qualcomm's "broad licensing program," which supposedly enabled the Company to obtain record revenues. Specifically, he stated: "Through our broad licensing program, we continue to foster innovation, and enable a large and growing ecosystem that benefits wireless consumers worldwide."

166.    The above statement was false, misleading, and omitted material facts when made. Contrary to Defendant Mollenkopf's statement that Qualcomm maintained a "broad licensing program" Qualcomm refused to license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers. The above statement also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy by which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

167.    On November 22, 2013, The San Diego Union Tribune published an interview with Defendant Altman. During the interview, Defendant Altman was asked "How come this licensing model has worked over the years?" In response, Defendant Altman stated that Qualcomm "make[s] [its patents] available to the industry through its licensing program…. It allows more and more competition to get into the marketplace where there is no way they would be able to otherwise."

168.    Defendant Altman's above statement was false and misleading when made. Contrary to Defendant Altman's statement, Qualcomm did not make its patents "available to the industry through [its] licensing program." Rather, Qualcomm refused to license its technology to

a substantial segment of the industry—namely, its competitor chipset manufacturers. The above statement also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, and Via Technologies; and (iii) Qualcomm maintained a successful licensing program by bundling the terms of its license agreements with the terms of its chipset agreements and by providing royalty relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm.

169.    During 2014, Qualcomm issued quarterly reports with the SEC on Form 10-Q. The quarterly reports were each signed by Defendant Mollenkopf on January 29, April 23, and July 23, 2014. Each of the reports touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

170.    The above statements were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard. The above statements also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii)

Qualcomm stifled competition by bundling the terms of its chipset and license agreements, conditioning royalty relief on a customer's exclusive use of Qualcomm chipsets.

171.    On February 18, 2014, Defendant Davidson gave an interview on "PowerTalk," an online program hosted by Chris Versace, editor of the investment newsletter PowerTrend Profits, about Qualcomm and the state of the mobile industry. During the interview, Defendant Davidson touted Qualcomm's purported business model, stating that Qualcomm "created this unique business model of not holding our patents to ourselves to advantage our own products, but creating a product of them and broadly licensing them on a pro-active basis."

172.    The above statement was false and misleading when made. Contrary to Defendant Davidson's statement that Qualcomm maintained a "business model of not holding our patents to ourselves to advantage our own products," Qualcomm in reality held its patents to itself by refusing to license the essential patents to competitor chipset manufacturers in order to advantage its chipset business. The above statement also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to license its standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

173.    On November 5, 2014, Qualcomm filed its annual report with the SEC for its fiscal year 2014 ("2014 Form 10-K"), which was signed by Defendant Mollenkopf. In the 2014 Form 10-K, the Company stated that it had "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." This statement was misleading and omitted material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies,

discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm has, in licensing its essential patents, discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

174. Qualcomm's 2014 Form 10-K also purported to describe the Company's contribution to "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to competitor chipset manufacturers the Company's patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

175. Qualcomm's 2014 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers. This statement also omitted material facts when made,

including that: (i) Qualcomm maintained a licensing policy in which it refused to license its standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

176.    Qualcomm issued quarterly reports with the SEC on Form 10-Q on January 28, April 22, and July 22, 2015. Each quarterly report was signed by Defendant Mollenkopf. All of the reports touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

177.    The above statements were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard. The above statements also omitted material facts when made, including that: (i) Qualcomm maintained a licensing policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

178.    On March 13, 2015, Defendant Mollenkopf was interviewed at the 12th SIEPR Economic Summit. During the interview, Mollenkopf touted the Company's "business model," which purportedly allowed "the entire market" to obtain a license, stating that "we figured out that the right business model was to actually focus on licensing the inventions, essentially through the standards bodies so that the entire market could play, instead of practicing the

inventions ourselves, and then we would enable more market participants to enter into that by selling kind of enabling technologies."

179.    The above statement was materially false and misleading when made. Contrary to Defendant Mollenkopf's statement that Qualcomm maintained a "business model," which purportedly licensed its technology to the standard-essential bodies "so that the entire market could play," Qualcomm refused to license its technology to an entire segment of the market— namely, its competitor chipset manufacturers. The above statement also omitted material facts when made, including that: (i) Qualcomm revised its licensing model in 2008 and, after that point, maintained a policy that refuses to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

180.    On November 5, 2015, Qualcomm filed its annual report with the SEC for its fiscal year 2015 ("2015 Form 10-K"), which was signed by Defendant Mollenkopf. In it, the Company stated that it had "committed to such standards bodies that we will offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." This statement was misleading and omitted material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies, discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has

discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

181.   Qualcomm's 2015 Form 10-K also purported to describe the status of the "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm curbed competition in the cellular communications industry, and did so by, among other things, refusing to license to chipset manufacturers its patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

182.   Qualcomm's 2015 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a wide array of wireless products and features while driving down average and low-end selling prices for 3G handsets and other wireless devices." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers. The statement also omitted material facts when made, including that: (i) Qualcomm's business and licensing model included refusing to license to competitor chipset manufacturers; and (ii) consistent with its business and licensing model, Qualcomm has refused to license its standard essential patents to competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.

183.    On November 17, 2015, Qualcomm issued a press release in response to the
KFTC Case Examiner's Report, which stated that the Company restricted market competition by
excluding its competitors. In Qualcomm's press release in response, Defendants stated that "the
allegations and conclusions in the [KFTC Case Examiner's Report] are not supported by the
facts." Defendants further represented that "[o]ur patent licensing practices, which we and other
patent owners have maintained for almost two decades, and which have facilitated the growth of
the mobile communications industry in Korea and elsewhere, are … pro-competitive."

184.    Defendants' above statements were false and misleading when made. Contrary to
Defendants' statements, the facts did support the KFTC Case Examiner's conclusion that
Qualcomm refused to license the standard-essential patents to competitor chipset manufacturers.
In addition, Qualcomm's licensing practices were not "pro-competitive," but rather stifled
competition by refusing to offer licenses to competitors and bundling the terms of its license and
chipset agreements. Finally, Qualcomm did not maintain the same licensing practices for "almost
two decades," as stated in its press release; rather, Qualcomm revised its licensing model in 2008
and, after that point, maintained a policy that refused to license the standard-essential patents to
competitor chipset manufacturers. The above statements also omitted material facts when made,
including that: (i) Qualcomm revised its licensing practices in 2008 and, after that point,
maintained a policy that refuses to license the standard essential patents to competitor chipset
manufacturers; (ii) Qualcomm has, in accordance with its revised policy, refused to license its
standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, and
Via Technologies; and (iii) Qualcomm maintained anti-competitive licensing practices, including
by bundling the terms of its license and chip-sale agreements and by discriminating against

potential licensees if they competed with Qualcomm or refused to buy all or most of their chipsets from Qualcomm.

185.   Qualcomm issued quarterly reports with the SEC on Form 10-Q on January 27, April 20, and July 20, 2016. Each quarterly report was signed by Defendant Mollenkopf. All of the reports touted "the benefits of our business model and our extensive technology investments in promoting a highly competitive … wireless industry" and "the success of our business model in enabling new, highly cost-effective competitors to their products."

186.   The above statements were false and misleading when made. Far from "promoting a highly competitive … wireless industry" and "enabling new, highly cost-effective competitors to their products," Qualcomm has refused to license competitors its patents essential to the cellular standard. The above statements also omitted material facts when made, including that: (i) Qualcomm maintained a policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm maintained a successful licensing program by bundling the terms of its license agreements with the terms of its chipset agreements and by providing royalty relief to Apple and other licensees who purchased all or most of their chipsets from Qualcomm.

187.   On January 27, 2016, Qualcomm made a presentation to investors during the first quarter 2016 earnings conference call. During the investor conference, Defendant Rosenberg touted how, "our licensing model, as you know, has been in effect for quite a few decades" and how this "licensing model of sharing our intellectual property" has "not only been effective, but has enhanced competition."

90

188.    The above statements were materially false and misleading when made. Contrary to Defendant Rosenberg's statement that Qualcomm's licensing model for "quite a few decades" has been "sharing our intellectual property," Qualcomm's licensing model refused to license its standard essential patents to competitor chipset manufacturers. The above statements also omitted material facts when made, including that: (i) Qualcomm revised its licensing model in 2008 and, after that point, maintained a policy that refuses to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies.

189.    On May 28, 2016, Defendant Aberle spoke at the Shanghai Forum about the Company's business model. Aberle stated that "you think about Qualcomm … [o]nce we solve [technological problems], we don't keep the technology to ourselves: our business model is to share that technology through licensing."

190.    The above statement was false and misleading when made and omitted material facts. Contrary to Defendant Aberle's statement, Qualcomm's business model included refusing to license its standard-essential patents to an entire segment of the industry—namely, its competitor chipset manufacturers. The above statement also omitted material facts when made, including that: (i) Qualcomm maintained a policy in which it refused to license the standard-essential patents to competitor chipset manufacturers; and (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others.

91

191.   On June 24, 2016, Defendant Rosenberg spoke to a group of reporters in China. In an article published by the Taipei Times, Defendant Rosenberg stated that "'[w]hen we charge our license, it will be fair, reasonable and non-discriminate. We have done that for 30 years.'"

192.   The above statement was materially false and misleading when made. Qualcomm has not licensed for the past 30 years on terms that are "fair, reasonable and non-discriminate." Rather, since 2008, the Company had discriminated against, and refused to license its standard-essential patents to, an entire segment of the industry—namely, its competitor chipset manufacturers. The above statement also omitted material facts when made, including that: (i) Qualcomm revised its licensing model in 2008 and, after that point, maintained a policy that refuses to license the standard-essential patents to competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

193.   ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

194.   On November 2, 2016, Qualcomm filed its annual report with the SEC for its fiscal year 2016 ("2016 Form 10-K"), which was signed by Defendant Mollenkopf. In the 2016 Form 10-K, the Company stated that it had "committed to such standards bodies that we will

offer to license our essential patents for these CDMA standards on a fair, reasonable and non-discriminatory basis." This statement was misleading and omitted material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies, discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.

195.    Qualcomm's 2016 Form 10-K also purported to describe the status of the "Competition," claiming that "[w]e have facilitated competition in the wireless communications industry by licensing our technologies to, and therefore enabling, a large number of manufacturers." This statement was false, misleading, and omitted material facts. Far from "facilitat[ing] competition," Qualcomm stifled competition in the cellular communications industry, and did so by, among other things, refusing to license to competitor chipset manufacturers its patents essential to the wireless standards, as well as by bundling the terms of its license and chip-sale agreements based on whether the customer would purchase exclusively Qualcomm chipsets.

196.    Qualcomm's 2016 Form 10-K also touted, and purported to describe, the Company's "strategy," stating that "[o]ur strategy to make our patented technologies broadly available has been a catalyst for industry growth, helping to enable a wide range of companies offering a broad array of wireless products…." This statement was false and misleading when made. Rather than "make [its] patented technologies broadly available," Qualcomm refused to

license its technology to an entire segment of the industry—namely, its competitor chipset manufacturers. The statement also omitted material facts when made, including that: (i) Qualcomm's business and licensing model included refusing to license to competitor chipset manufacturers; and (ii) consistent with its business and licensing model, Qualcomm has refused to license its standard-essential patents to competitor chipset manufacturers, including MediaTek, Samsung, Intel, and Via Technologies.

197. 

198.    On January 17, 2017, the FTC filed an enforcement action against Qualcomm in the United States District Court for Northern District of California, stating that Qualcomm refused to license its cellular standard-essential patents to competitors and entered into exclusive dealing arrangements with large mobile-phone manufacturers in violation of antitrust laws. That same day, Qualcomm issued a press release in response to the FTC complaint. In it, Defendant Rosenberg again assured investors that the Company engaged in "broad-based licensing of those technologies [the standard-essential patents] on fair, reasonable and nondiscriminatory terms."

199.    Defendant Rosenberg's statement above was materially false and misleading when made. Defendant Rosenberg's statement that Qualcomm's licensing was "broad-based" and completed on "fair, reasonable and non-discriminatory terms" was false and misleading because Qualcomm discriminated against, and refused to license to, competitor chipset

manufacturers, including MediaTek, Samsung, Intel, and Via Technologies. The Company also discriminated against licensees that would not buy all or most of their chipsets from Qualcomm and tied the terms of the license agreements to the terms of the chipset agreements. The above statement also omitted material facts when made, including that: (i) Qualcomm has, contrary to its commitment to the standard-setting bodies, discriminated against, and refused to license its standard-essential patents to, competitor chipset manufacturers; (ii) Qualcomm has, in accordance with its revised policy, consistently refused to license its standard-essential patents to competitor chipmakers, including MediaTek, Samsung, Intel, Via Technologies, and others; and (iii) Qualcomm, in licensing its essential patents, has discriminated against and provided unfavorable terms to customers that did not purchase chipsets exclusively from Qualcomm.



## VII.    THE SECURITIES CLASS ACTION SURVIVES A MOTION TO DISMISS

202.    On March 18, 2018, the court in the Securities Class Action denied Defendants' Motion to Dismiss, noting that plaintiffs in the Securities Class Action had: (i) "sufficiently

allege[d] Defendants made false or misleading statements regarding its broad and non-discriminatory licenses practices;" (ii) "sufficiently allege[d] Defendants misled investors when it made statements about its licensing practices being decades old;" (iii) "allege[d] with sufficient specificity, that Defendants misrepresented that Qualcomm did not bundle and kept the licensing business and chipset business separate;" and (iv) sufficiently set forth allegations that give rise to a strong inference that Defendants acted with the required state of mind.

## VIII.   DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

203.    As detailed throughout this complaint, Defendants engaged in an elaborate scheme throughout the Relevant Period to defraud investors through numerous materially false and misleading representations and omissions concerning the Company's licensing practices.

204.    At all relevant times, Defendants were aware or disregarded that their representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company and its financial condition and prospects.

205.    By reason of their positions as officers, directors, and/or fiduciaries of Qualcomm, and because of their ability to control the business and corporate affairs of Qualcomm, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Qualcomm in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Qualcomm and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

206.    Each director and officer of the Company owes to Qualcomm and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

207.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

208.    Pursuant to the Audit Committee Charter of Qualcomm, the purpose of the Audit Committee shall be to "oversee the accounting and financial reporting processes of the Company and audits of the Company's consolidated financial statements."   Specifically, the Audit Committee Charter states:

1. Review and discuss with management and the independent auditor:

a. The Company's annual audited consolidated financial statements.

b. The Company's interim condensed consolidated financial statements included in quarterly filings.

c. The Company's Quarterly Reports on Form 10-Q, Annual Reports on Form 10-K and other SEC filings containing the initial disclosure of financial statement information

d. Earnings press releases, including, if appropriate, the use of non-GAAP financial measures.

e. Any report rendered by the independent auditor relating to the consolidated financial statements of the Company.

f. The critical accounting policies and practices used by the Company, other reasonable alternative treatments of financial information within accounting principles generally accepted in the United States, the

ramifications of the use of such alternative treatments and the treatment preferred by the independent auditor.

g. Any significant judgments made in management's preparation of the financial statements and the view of the independent auditor as to the appropriateness of such judgments.

h. Any non-de minimis off-balance sheet transactions or structures and their effect on the Company's financial results and operations, as well as the disclosure regarding such transactions and structures in the Company's public filings.

i. Any significant complex or unusual transactions.

j. Any material changes to the Company's application of accounting principles and practices, including, but not limited to, those affected by new accounting regulations and/or requirements, used in preparing financial statement to be filed with the SEC.

k. Any correspondence with regulators or governmental agencies that raise material issues regarding the Company's consolidated financial statements or accounting policies.

l. Any information coming to the attention of Company management, the Committee or the independent auditor that raises material issues regarding the Company's financial statements or accounting policies.

2. Recommend to the Board whether the audited consolidated financial statements should be included in the Company's Annual Report on Form 10-K.

3. Periodically (but not less than annually) meet separately with the independent auditor.

*       *       *

1. Review and discuss annually with management its assessment of the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures.

### **Duties Pursuant to the Company's Code of Ethics**

209.   The Individual Defendants, as officers and/or directors of Qualcomm, were also

bound by the Company's Code of Ethics which sets out basic principles to guide all directors,

officers, and employees of Qualcomm, who are required to know and conduct themselves in accordance with the Code of Ethics, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

210.    The purpose of the Code of Ethics is to promote:

• Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• Full, fair, accurate timely and understandable disclosure in reports and documents that QUALCOMM files with, or submits to, the United States Securities and Exchange Commission ("SEC") and in other public communications;

• Compliance with applicable governmental laws, rules and regulations;

• The prompt internal reporting of violations of this Code; and

• Accountability for adherence to this Code.

211.    The Code of Ethics notes that:

QUALCOMM is committed to ensuring that all disclosures in reports and documents that the Company files with or submits to the SEC, as well as other public communications made by the Company, are full, fair, accurate, timely and understandable. The Company's CEO, President, CFO and Controller ("Senior Officers") are ultimately responsible for taking all necessary steps to ensure that this occurs. All Company Employees and Directors shall take appropriate steps within their area of responsibility to ensure the same.

212.    Accordingly, the Individual Defendants were responsible to ensure that disclosures in the Company's reports and other documents filed with the SEC and issued public were materially complete and contained no misrepresentations or omissions.

213.    Upon information and belief, the Company maintained versions of the Code of Ethics during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## IX.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

214.    Plaintiff brings this action derivatively in the right and for the benefit of Qualcomm to redress injuries suffered, and to be suffered, by Qualcomm as a direct result of violations of federal securities laws by the Defendants. Qualcomm is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

215.    The Board of Qualcomm, at the time this action was commenced, consisted of McLaughlin, Fields, Henderson, Livermore, Manwani, Miller, Mollenkopf, Randt, Rosenfeld, Smit, and Vinciquerra, a total of 11 individuals.

216.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Qualcomm Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

### Demand is Futile as to Defendant Mollenkopf Because His Principal Professional Occupation as the Company's CEO

217.    Defendant Mollenkopf has been the Company's Chief Executive Officer since March 2014 and a director since December 2013. In his role as CEO for fiscal years 2016, 2017, 2018, and 2019 Defendant Mollenkopf received $11,066,012, $11,591,310, $19,975,472, and $23,065,052 in total compensation respectively. Because Defendant Mollenkopf's primary source of income and primary employment is his employment as CEO of Qualcomm and his professional reputation is inextricably bound to his role at Qualcomm, Defendant Mollenkopf is incapable of acting independently and demand is futile upon him.

### Demand is Futile as to the Audit Committee Defendants

100

218.    Demand is futile as to Defendants Henderson and Vinciquerra (collectively, the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

219.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The Audit Committee Charter notes that the purpose of the Audit Committee shall be to "oversee the accounting and financial reporting processes of the Company and audits of the Company's consolidated financial statements."

220.    Specifically, the Audit Committee Charter notes that the Audit Committee is responsible to:

> Review with the principal executive and financial officers of the Company any report on significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weakness in internal controls identified to the independent auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

221.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

222.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning Qualcomm's artificially inflated stock prices.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing

documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

223.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

224.    A host of facts, in addition to those discussed above, support a strong inference that Qualcomm and the Executive Defendants knew or were deliberately reckless in not knowing the true facts concerning Qualcomm's licensing and chipset sales practices when making the materially false and misleading statements and omissions discussed herein.

225.    First, Qualcomm has admitted that it intentionally refused to license its standard-essential patents to competitor chipmakers. As discussed above, the Executive Defendants repeatedly told investors both before and during the Relevant Period that they licensed to "anyone," "never refused to license," made their patents "available to the entire industry," and licensed to "all interested companies on terms that are fair, reasonable and non-discriminatory." However, as stated in the KFTC's January 2017 Order, Qualcomm "consistently admitted" during the non-public investigation that by 2008, it "established a business policy amending their license programs" and began "refus[ing] to execute license agreements with competing modem chipset manufacturers even if they requested [standard essential patents]." Qualcomm's

admission that the Company, in fact, intentionally refused to license to competitors pursuant to a changed business policy demonstrates knowledge by the Director Defendnats.

226.    Second, Qualcomm and the Executive Defendants knew and acknowledged publicly that a refusal to license competitors would be an improper, discriminatory act in violation of the Company's FRAND commitment. For example, in speaking to the FTC, Qualcomm specifically acknowledged that "[c]ertainly, a patent-holder who gives a FRAND commitment gives up the right to refuse to license." And Defendant Rosenberg further acknowledged and publicly stated that "a decision that we are going to license you and not license you … would be discriminatory." That Defendants knew—and publicly acknowledged—that their refusal to license to competitors was, indeed, "discriminatory" and a violation of FRAND further supports an inference of knowledge by the Director Defendants.

227.    Third, the long duration of Defendants' refusal to license competitors and discriminatory bundling of its license and chipset agreements supports an inference of scienter. By 2008, Qualcomm amended its policy and refused to license its standard-essential patents to chipset competitors. During the ensuing period, major competitors—including MediaTek, Samsung, Intel, and Via Technologies— made repeated requests to Qualcomm's executives for a license and were categorically denied. Likewise, Qualcomm has, contrary to Defendants' representations, bundled the terms of its license agreements and chipset agreements for many years. Indeed, its agreements with Apple in 2007, 2011, and 2013 all provided for royalty relief conditioned on the exclusive use of Qualcomm chipsets. Business policies maintained for nearly a decade and across a Company's client and competitor base do not happen by accident or without the knowledge of the Company's executives and Director Defendants.

Case 1:20-cv-00748-LPS  Document 6  Filed 08/06/20  Page 104 of 122 PageID #: 253

228.    Fourth, Qualcomm's purported commitment to "non-discriminatory" licensing was a critical Company policy. Indeed, as Defendant Davidson acknowledged, Qualcomm's commitment to "license anyone who wants to go andhave a license in CDMA" was the "hallmark" of Qualcomm's licensing policy. For this reason, Alex Rogers, Qualcomm's Senior Vice President and Legal Counsel, colorfully stated prior to the Relevant Period that, "[s]aying we refuse to license competitors is like saying McDonald's refuses to sell hamburgers… It's nuts. It's crazy." That Qualcomm would violate its "hallmark" policy is compelling evidence of of knowledge by the Director Defendants.

229.    Fifth, Defendants' refusal to license the Company's standard-essential patents to competitors was unprecedented. MediaTek's general counsel confirmed that, to his knowledge, Qualcomm is the only chipmaker in the cellular industry that has a policy of refusing to license its standard-essential patents to other chipmakers. Indeed, as Professor Carrier explained, "a refusal to license, after having made the FRAND commitment, is as fundamental a breach of the FRAND licensing promise as can be envisioned." The Individual Defendants knew or were deliberately reckless in not knowing that the Company had such a blatantly anti-competitive policy and practice.

230.    Sixth, Qualcomm's misrepresentations concern its core businesses. As Defendant Jacobs acknowledged during a March 5, 2013 investor conference, ***Qualcomm's licensing business (QTL) and its chip business (QCT) are its two "core businesses."*** The Company's press releases filed on Form 8-K during the Relevant Period further confirmed that these two businesses were, in fact, Qualcomm's two "core operating businesses." The Company's annual reports on Form 10-K during the Relevant Period likewise acknowledged that Qualcomm conducts its business "primarily through" QCT and QTL. Indeed, during each year from 2012 to

2016, between 96% and 99% of the Company's total revenues were derived from its licensing and chip businesses. Particularly given their near-total contribution to the Company's bottom line, it is reasonable to believe the Director Defendants were kept will informed of the Company's actual undisclosed licensing practices.

231.    Seventh, the Executive Defendants were directly and extensively involved in developing and maintaining Qualcomm's licensing model, as well as negotiating its key licensing and chipset sales agreements:

- Defendant Altman played a key role in designing and implementing the Company's licensing model. According to Qualcomm's founder Dr. Irwin Jacobs, Altman was the "principal person in working through the very many contracts that we have signed, licensing agreements, with over 100 companies around the world." At one annual shareholder meeting, Altman was likewise introduced by the Company as the "strategist and negotiator who is primarily responsible for guiding the development of the company's intellectual property protection and licensing strategy." At that same shareholder meeting, Altman acknowledged that he had "been an active participant in essentially every major transaction in which the company has taken part." Similarly, Altman has been described by the Company as "very involved in the process of licensing contracts and negotiations the company has had over the last several years," and the "chief architect of the Company's licensing business model."[70] Defendant Altman was a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- Defendant Aberle also played an integral role in the preparation and negotiation of the Company's license agreements over the past decade, as well as overseeing and executing its licensing model. The Company has recognized, and stated publicly, that Defendant Aberle was "responsible for overseeing Qualcomm's technology and IP licensing business" and "[f]or well over a decade, [Defendant Aberle] has played a leading role in structuring and negotiating key license agreements with Qualcomm's licensees."[71] For example, Qualcomm has publicly stated that Aberle "played a leading role in structuring and negotiating key license agreements with many of our leading licensees, including Ericsson, Huawei, LGE, Motorola, Nokia, RIM, Samsung, ZTE, and many others." Defendant

---

[70] Press Release, "Qualcomm Announces Leadership Change and Promotions" (Oct. 4, 2011).

[71] Website biography, Qualcomm Inc., Leadership: Derek K. Aberle, President, https://www.qualcomm.com/company/about/leadership/derek-aberle.

Aberle was further described by Defendant Altman as having "significantly contributed to QTL's success by expanding Qualcomm's licensing program." During an April 23, 2014 earnings call, Defendant Mollenkopf described Aberle as "instrumental in creating and growing many important areas of Qualcomm's business over his tenure, including our licensing business." Defendant Aberle is a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- Defendant Rosenberg oversees Qualcomm's legal matters and participated in the Company's licensing negotiations. Addressing the Company's stockholders in 2016, Defendant Rosenberg emphasized that members of executive management, including himself, were directly involved in the Company's licensing program, stating that "[w]e try to negotiate all the time. That's what we do."[72] Rosenberg frequently communicated with regulatory bodies, including the Senate and FTC on behalf of Qualcomm. Defendant Rosenberg was a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- Defendant Davidson was directly involved in operations, reporting, and investor relations, as well as executing on the Company's strategic global business activities. At a Citigroup investor conference, when discussing his involvement with the licensing program, Davidson stated that "we talk to our licensees and then obviously our chip customers on an ongoing basis." Both prior to and during the Relevant Period, Defendant Davidson was personally involved in the Company's representations to investors that Qualcomm purportedly "will license anyone who wants to go and have a license in CDMA. And that has been the hallmark of that licensing program."

- Defendant Mollenkopf oversaw the rise of Qualcomm's chipset business and was directly involved in negotiating key chipset agreements. At a New York analyst meeting on November 12, 2009, Mollenkopf stated "I run the chipset business here at Qualcomm" and, at a 2014 investor conference, Mollenkopf further stated that the "first thing to remember is I've been at the Company for a pretty long time, so a little bit shy of 20 years. And in particular really focusing on the chip group for really the last 5 years."[73] Defendant Mollenkopf was a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

- Defendant Jacobs also played a significant role in Qualcomm's adoption of Qualcomm's technologies as industry standards, as well as the Company's licensing policies. As Qualcomm has acknowledged on its website, Defendant Jacobs was "a key architect of Qualcomm's strategic vision" with responsibilities

---

[72] Transcript, "Qualcomm Inc. Annual Shareholders Meeting" (Mar. 8, 2016).
[73] Transcript, "Qualcomm at Goldman Sachs Technology and Internet Conference" (Feb. 12, 2014).

including "leadership and oversight of all the Company's initiatives and operations." As the Company's former CEO, Jacobs acknowledged that he made the key decisions as to the Company's "business structure" and made "fundamental changes to enhance value."[74] Defendant Jacobs was also a member of Qualcomm's Executive Committee, which "drive[s] Qualcomm's overall global strategy."

232.    During the Relevant Period, the Executive Defendants participated in and supervised negotiations with handset customers that tied together technology licensing and chipset sales. A former Executive Vice President of Products for Blackberry Limited (f/k/a Research In Motion, Ltd.) ("Blackberry") from March 2006 until January 2014, confirmed that Qualcomm upper management, including Defendants Mollenkopf and Jacobs, was involved in "blended discussions" of technology licensing and chipset purchases with Blackberry. The former Executive Vice President attended meetings with Qualcomm's executives and was personally involved in negotiations with Qualcomm on behalf of Blackberry, which designs and manufactures mobile devices and is a Qualcomm chipset customer. The former Blackberry executive recalled that Defendant Mollenkopf participated in a number of meetings with Blackberry executives, including Blackberry's COO, which involved negotiations over the terms of licenses and chipset deals, and Defendant Jacobs participated in a similar high level meeting regarding the 7600 chipset. Additional representatives from both Qualcomm's licensing division and its chipset division, including the Executive Defendants' direct reports, were also directly involved in these "blended discussions," according to the former BlackBerry executive. He noted that, in fact, one of the Qualcomm employees that the former Blackberry executive dealt with most directly—the "guy who was pushing the chipsets"—was actually a Vice President from Qualcomm's licensing department.

---

[74] Press Release, "Qualcomm Completes Review of Corporate and Financial Structure" (Dec. 15, 2015).

233.    Eighth, the Executive Defendants made repeated, detailed and unequivocal statements to investors about the Company's licensing model. As set forth above, Qualcomm and the Executive Defendants frequently told investors that the Company licensed on a non-discriminatory basis and did not bundle their chipsale and license agreements, making the statements in the Company's quarterly and annual SEC filings, regular investor conferences and press interviews. They prominently touted without reservation the Company's licensing model and purported commitment to licensing across the industry on a non-discriminatory basis. Having focused on the Company's licensing model so often in their representations to investors, the Executive Defendants knew, or at minimum, were deliberately reckless in not knowing, the Company's actual licensing model.  It is reasonable to infer that the members of the Board would have been kept well informed of the Company's actual licensing model due to this focus.

234.    Ninth, the Executive Defendants issued specific denials about the anticompetitive practices at issue. The Executive Defendants made many of their statements during the Relevant Period in response to questions from analysts and investors. For example, on November 27, 2012, Defendant Aberle, responding to an analyst, stated that "within the Company, we tend to keep the licensing and the chip business very separate," and "we don't bundle those together." Again, on February 25, 2013, when Defendant Mollenkopf was asked at the GSM Association Mobile World Conference about the strategic benefits of having the royalty and chip business under the same roof, Mollenkopf responded that the licensing business and the chip business were "really separate businesses," that the Company had been "very clear" that it kept the businesses separate, and that they were "separate propositions to the customer."

235.    Moreover, the Individual Defendants continued to deny and conceal Qualcomm's true licensing practices even after regulators raised concerns and Qualcomm "consistently

admitted" to the KFTC, but not the public, that it refused to license competitors. For example, on November 17, 2015, Qualcomm issued a press release in response to the KFTC Case Examiner's Report, which stated that Qualcomm suppressed market competition by excluding competitors. In its press release, Qualcomm quieted investors' concerns about the Report with assurances that "the allegations and conclusions in the [KFTC's Report] are not supported by the facts," further impressing upon investors that Qualcomm's "patent licensing practices, which we and other patent owners have maintained for almost two decades [are] procompetitive." Again on January 17, 2017, almost immediately after news broke of the FTC's enforcement action, Qualcomm shot back with a press release sharply disputing the government's assertions. In it, Defendant Rosenberg assured investors that, contrary to the FTC's assertions, Qualcomm engaged in "broad-based licensing of [its standard-essential patents] on fair, reasonable and non-discriminatory terms." Rather than disclose to investors the Company's actual licensing practices, Defendant Jacobs and the other Executive Defendants blamed "competitors who obviously don't like the fact that you're so successful," and claimed that investigations were a natural consequence of competitors' "envy" of the Company's success.

236.    Tenth, the Individual Defendants knew that investors and analysts were focused on their licensing model. As Defendant Rosenberg stated during an investor conference before the Relevant Period, "clearly [Qualcomm's] business model has been the topic of a lot of discussion over the last few years." Indeed, past allegations had arisen— which Qualcomm aggressively and successfully assured investors were false—that certain aspects of Qualcomm's licensing practices may be inappropriate.[75] Analysts and the press published reports that

---

[75] The Individual Defendants assured investors regarding these past allegations of inappropriate licensing practices that competitors had "attempted to flood the market with a lot of misinformation"; that the allegations are "are inaccurate and without merit"; that the "result in

accepted and repeated Defendants' representations in that regard as well as dismissed the allegations denied by the Company. For example, accepting Defendants' representations, analysts at *Barron's* reported during the Relevant Period that Qualcomm "[i]n addition to manufacturing its own chips, licenses its technology to other chipmakers." Analysts at BMO likewise stated that, in light of the Company's representations and denials, "[w]e do not think the company engages in this anticompetitive practice" of bundling. The Individual Defendants were thus well aware that the market was heavily relying on the accuracy of their statements.

237.    Eleventh, in addition to assuring investors, the Individual Defendants certified to the standard-setting bodies that the Company licensed its standard-essential patents on fair, reasonable, and non-discriminatory basis. Defendant Altman and Qualcomm sent written declarations to standard-setting bodies—including ETSI, CTIA, TIA, ANSI, and ATIS—certifying that the Company was licensing its standard-essential patents to all willing licensees on fair, reasonable, and non-discriminatory terms. Based on this commitment, Qualcomm's technologies were adopted broadly by standard setting bodies as cellular standards for much of the developed world. This commitment bound the Company and the Executive Defendants because, as Professor Carrier has explained, "[f]or FRAND to be effective, company officials who agree to the commitment must recognize the binding nature of such a promise; otherwise the FRAND commitment would not mean anything." The Executive Defendants knew, or were

---

China is unique to China"; that China's Anti-Monopoly Law "is different in several respects from anti-trust and competition laws in other countries"; that the regulatory issues were actually "commercial disputes"; that the allegations were part of efforts to "avoid paying fair and reasonable royalties"; and that scrutiny is "instigated by competitors who obviously don't like the fact that [Qualcomm] is so successful," among other things. Indeed, during one pre-Relevant Period investor conference, in the context of disputing these prior challenges, Defendant Altman specifically assured investors that "[w]e've never refused to license our WCDMA essential patents to any company, and we have never required any company to exclusively buy our WCDMA chips for any purpose."

deliberately reckless in not knowing, that Qualcomm was not abiding by the commitment it had repeatedly made.

238.    Twelfth, Qualcomm's anti-competitive practices were directed at the Company's biggest customers and competitors. Between 2011 and 2016, Qualcomm forced Apple—its single largest customer, which alone provided Qualcomm with up to 30% of its total earnings— into an exclusivity arrangement. As part of that arrangement, Qualcomm conditioned billions of dollars in royalty rebates on Apple's purchase of chipsets exclusively from Qualcomm. In addition, Qualcomm has entered into bundling arrangements with other major customers, including Samsung and LG, two more of the world's leading cell phone makers. Contracts involving 30% or more of the Company's total earnings and royalty relief payments of this magnitude do not go unnoticed by senior management and/or the Board of Directors.[76]

239.    Thirteenth, industry participants and key customers complained to Qualcomm and its executives about their refusal to license competitors and bundling. For example, Bruce Sewell, Apple's Senior Vice President and General Counsel, complained to Defendant Aberle "at various times in the past years" about "Qualcomm's refusal to license on a fair, reasonable, non-discriminatory" basis and forewarned him of the "eventuality" that Apple, as a result, would stop

---

[76] As the former senior member of Apple's Patent Licensing & Strategy department with many years of industry experience explained: "A senior executive would see where money was coming in, and where money was going out. Usually, money comes in to pay for the chips and that's it. They certainly would have known what money was going out because we are talking about billions of dollars here, not little amounts of money. It could be bigger than a whole department's annual budget." Moreover, as to whether the Executive Defendants would be aware of Qualcomm's policy of refusing to license competing chipmakers, this former high-level Apple employee noted that "it's unthinkable to me that the people running the most profitable part of their business wouldn't have been making senior management very aware of how that's accomplished, especially if the same companies paying you for licensing agreements are also the ones buying your chips."

making royalty payments.[77] Likewise, Motorola's CEO told Qualcomm and its CEO during the Relevant Period that Motorola was "sick of how [Qualcomm was] doing things," referencing Qualcomm's refusal to license competitors as part of Motorola's list of "grievances." And, as a final example, MediaTek and other chipset makers repeatedly complained to Qualcomm and its executives about the Company's blanket refusal to license competitors. In light of the repeated complaints, the Individual Defendants knew—or were deliberately reckless in not knowing—of the Company's refusal to license and bundling tactics.

240.   Fourteenth, Qualcomm and the Executive Defendants' refusal to license competitors and its bundling involved serious violations of laws. In its enforcement action, which has been sustained by a federal court in this Circuit, the FTC stated that Qualcomm's "refus[al] to license FRAND-encumbered patents to baseband processor competitors … is anticompetitive and constitutes an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)." The KFTC likewise determined that Qualcomm's conduct was illegal under Korean law and fined the Company nearly one billion dollars. In addition, competition authorities in the EU and Taiwan have leveled similar charges, and the European Commission preliminarily concluded that Qualcomm violated EU antitrust laws by paying Apple to exclusively use Qualcomm's chipsets. That Defendants' undisclosed licensing practices involved grave violations of the laws that already have resulted in nearly a billion dollars in fines further supports an inference of knowledge by the Director Defendants.

241.   Fifteenth, Qualcomm's refusal-to-license-competitors policy enabled Defendants to establish market dominance. Qualcomm's policy of refusing to license its standard-essential patents to competitor chipmakers has, since being implemented in 2008, foreclosed meaningful

---

[77] Letter from B. Sewell to D. Rosenberg, dated April 25, 2017.

competition in the mobile chipset market and allowed Qualcomm to seize a commanding market-share lead. Among the eleven major chipset companies, nine have been forced out of the chipset market since 2008. And although the size of the overall modem chipset market has doubled since 2008, there has not been a single new meaningful entrant into the market. By 2015, Qualcomm accounted for nearly 60% of all mobile chipset sales worldwide, and nearly all third-party chipset sales for top-tier smartphones such as Apple's iPhone. Qualcomm's policy of refusing to license to competitors fulfilled its purpose of squeezing out rivals and more than doubled the Company's revenues, from $11.1 billion in 2008 to $25.3 billion in 2015—far beyond that of any remaining competitor. Changes in licensing policies that force competitor chipmakers to exit the market—and lead to billions of dollars in increased revenues—do not occur without the direction and approval of a company's top executives and/or Board of Directors.

242.     Sixteenth, Qualcomm and the Executive Defendants insisted that their contractual counterparties accept "gag orders" and "no challenge" provisions in their agreements to shield the Company's anti-competitive practices from public scrutiny. As set forth in the second paragraph of Section 7 of Apple and Qualcomm's 2013 Business Cooperation and Patent Agreement, Qualcomm conditioned royalty relief on Apple's agreement not to initiate or induce a regulatory action against Qualcomm, including for "claims that Qualcomm failed to offer a license to its SEPs on FRAND terms." Invoking this "gag provision," Qualcomm recently retaliated against Apple for providing information to the KFTC by withholding over $1 billion in royalty rebates. In addition to Apple, Qualcomm inserted "gag provisions" and "no challenge" clauses in its agreements with other industry participants. For example, Blackberry's former Executive Vice President of Products has confirmed that Qualcomm's license agreement with

Blackberry also contained a no challenge clause. Qualcomm has also insisted that the terms of its agreements are "confidential" and thus cannot be shared. Qualcomm's insistence on contractual terms with the express purpose of silencing counterparties from reporting to authorities is yet further evidence of knowledge by the Director Defendants.

243.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information (including the above) related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.  This is even more true given the importance of the Company's licensing practices to its financial success.

244.    

245.

246.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business

and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

247.   In addition, as a product of Qualcomm's anticompetitive conduct, the six Executive Defendants collectively received nearly $400 million in compensation during the Relevant Period, which was heavily weighted on stock awards and other incentive compensation. For example, Defendant Aberle earned about $720,000 to $890,000 in annual salary, yet he received annual stock awards and other incentive compensation totaling over $62 million during the Relevant Period. Defendant Mollenkopf similarly earned between $805,000 and $1.1 million in annual salary, yet he received annual stock awards and other incentive plan compensation totaling nearly $105 million during the Relevant Period.

248.   The Executive Defendants also capitalized on their materially false and misleading statements and omissions to investors by disposing of personally-held shares at artificially inflated prices. During the Relevant Period, Defendant Jacobs collected over $155 million from sales of his personal Qualcomm holdings; Defendant Altman collected over $74 million from sales of his personal Qualcomm holdings; Defendant Aberle collected nearly $50 million from sales of his personal Qualcomm holdings; Defendant Mollenkopf collected over $45 million from sales of his personal Qualcomm holdings; and Defendant Rosenberg collected over $40 million from sales of his personal Qualcomm holdings. In total, the Executive Defendants sold over $365 million of their personally-held Qualcomm shares during the Relevant Period at artificially inflated prices. Thus, the Executive Defendants were strongly incentivized to develop and maintain practices that ensured Qualcomm's market dominance and artificially drove up the price of Qualcomm shares.

249.     Despite the Director Defendants' awareness of the above allegations, the Board has taken no meaningful steps to: (1) identify offending parties who knowingly participated in the alleged misconduct; or, (2) create and institute specific policies to be enforced by specific persons (or positions) with specific delineated responsibilities and reporting obligations, to oversee the risk of corrupt employee practices concerning the Company's licensing.

250.     By its above described failure to take reasonable action to identify the offending employees (including, but not limited to the Executive Defendants) who participated in the execution of the misconduct detailed herein, and by its above described failure to take reasonable corrective action in response, the Director Defendants have ratified that past conduct and indicated their willingness to knowingly tolerate it in the future.

251.     The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of knowledge by the Director Defendants.

252.     Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

### Against the Executive Defendants Against the Officer Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

253.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

254.    As a result of the conduct and events alleged above, Qualcomm has been named as a defendant in the Securities Class Action brought on behalf of Qualcomm shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

255.    Federal law provides Qualcomm with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U.S. 286, (1993), Qualcomm has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Qualcomm to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Securities Class Action, and sets forth specific rules regarding the determination of claims for such contribution.

256.    Accordingly, Plaintiff, on behalf of Qualcomm, hereby claims contribution against the Officer Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with Qualcomm under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Qualcomm.

257.    Qualcomm claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Executive Defendants**

258.    Throughout the Relevant Period, the Executive Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning, *inter alia*, Qualcomm's licensing practices.   These

117

statements were materially misleading to persons who purchased Qualcomm securities during the Relevant Period.

259.    The plaintiffs in the Securities Class Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Qualcomm securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

260.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

261.    The plaintiffs in the Securities Class Action were unaware of the false and misleading nature of said statements and omissive disclosures.

262.    When the Executive Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Qualcomm, the Officer Defendants were privy to information regarding the Company's licensing practices.

263.    Accordingly, the Executive Defendants are liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Qualcomm were to be held liable in the Securities Class Action, the Executive Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Qualcomm.

## COUNT II

### Against the Defendants for Breaches of Fiduciary Duty

264.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

265.    Defendants owed and owe Qualcomm fiduciary obligations. By reason of their fiduciary relationships, Defendants, owed and owe Qualcomm the highest obligation of good faith, loyalty, and due care.

266.    Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Qualcomm shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

267.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Qualcomm to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Qualcomm and its shareholders. As a result, Defendants grossly mismanaged the Company.

268.    As a direct and proximate result of their failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

269.    Plaintiff, on behalf of Qualcomm, has no adequate remedy at law.

## COUNT III

### Against the Defendants for Unjust Enrichment

270.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

271.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Qualcomm.

272.    Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Qualcomm.

273.    Plaintiff, as a shareholder and representative of Qualcomm, seeks restitution from Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and breaches of fiduciary duty.

274.    Plaintiff, on behalf of Qualcomm, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Qualcomm and that Plaintiff is an adequate representative of the Company

B.    Determining and awarding to Qualcomm the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Qualcomm to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Qualcomm and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote

resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a provision to permit shareholders of Qualcomm to nominate a majority of the candidates for election to the Board to replace existing directors;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Qualcomm's directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

D.     Awarding to Qualcomm restitution from the Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: June 3, 2020                          Respectfully submitted,

                                             **O'KELLY & ERNST, LLC**

                                             */s/ Ryan M. Ernst*
                                             Ryan M. Ernst, Esq. (#4788)
                                             824 N. Market Street, Suite 1001A
                                             Wilmington, DE 19801
                                             Phone (302) 778-4000
                                             Email: rernst@oelegal.com

                                             *Attorneys for Plaintiff*

**LIFSHITZ LAW FIRM, P.C.**
Joshua M. Lifshitz
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376